## DAVIS *v.* THE STATE

The evidence was insufficient to support the verdict finding the defendant guilty of rape, and the trial court therefore erred in refusing to grant a new trial.

No. 2389, DECEMBER 13, 1921.

Indictment for rape. Before Judge Blair. Cobb superior court. December 31, 1920.

I. A. Davis was tried for the offense of rape alleged to have been committed on the person of Lucile Bryant. The jury returned a verdict of guilty, and recommended the defendant to the mercy of the court. A motion for new trial was made on the general grounds that the verdict was contrary to law and the evidence and without evidence to support it, etc. No other grounds were added by amendment to the motion for new trial; and the case coming on to be heard, the trial judge denied the motion and refused a new trial. The bill of exceptions assigns error upon that judgment.

The evidence submitted at the trial, so far as necessary to be stated, was as follows. Lucile Bryant, the alleged injured female, testified: that the defendant, commonly called Gus Davis, is her stepfather and 52 years old; that at the time of the alleged offense she was 14 years of age and within 2 months of her 15th birthday; that on Tuesday, September 7, 1920, she with her 12-year-old sister Lodine Bryant, and 12-year-old stepbrother Joe Brown Davis, went "muscadine hunting" about 10 o'clock in the morning, alone a branch near her home; and that while they were on the branch for such purpose the defendant appeared. With reference to what then occurred the witness testified, on her direct examination: "He [defendant] told me to come on one side of the branch and go with him, and for my little sister and stepbrother to go on the other side and hunt muscadines. . . I obeyed him. I went up in a little piece of woods; it was bushes and trees. It was a good piece from where the other children were. Not in their sight. No one else was present with Gus Davis and myself. After we got there to this place where it was grown up in bushes, he throwed me down. He did something to my clothes; he pulled them up. He then undone his clothes. I was still on the ground; he got on top of me. He did something to me when he was on top of me; he touched my private parts with something. He touched my private parts with his private parts. He put his in mine. . . I could not see the other children then. After that I went home. Then Gus Davis went off to a negro's house. I remained at home the rest of that day. . . He went to town that evening late. I did not tell anybody about this when I got home, but I did next morning. I told Mama. These are the underclothes I had on at

that time. I didn't tell any one that night, because I was afraid
he would come home and kill me that night if I told Mama. I
lived with my mother. She is the wife of the defendant. I have
been living with my stepfather four years. He has been mean to
me. Within a month or so before this transaction he whipped
me with a razor strap. I was afraid of him. I was a witness
down stairs at the commitment trial. . . At the time he put
his private parts into my private parts, I did not give my con-
sent. I was not willing at any time during the transaction." The
witness testified thus on her cross-examination: " He saw us
getting muscadines and came and shook the vines for us. It was
just a few minutes after he shook the vines before we started up
the branch and he told them to go on one side and me and him
go on the other. It was about ten or fifteen minutes from the
time we got the first muscadines until he laid me down on the
ground. It was just about that long — I don't know what time
it was. It was about a half an hour from the time when he first
came down there where we were first getting muscadines until he
went on to the negro house. It was about three minutes from the
time he laid me down on the ground before he left and went to
the negro house. I was not paying any particular attention to
how long I was on the ground, I just guess at it. I laid on the
ground about three minutes. He throwed me down. He just
pushed me down, is all that I know. He put his hand on my
shoulder; he pushed me, and I fell backwards. When I fell back-
wards, I lay there until he got on me. I didn't try to get up.
I didn't scream. I didn't call my little brother or sister. I
didn't call my mother. I didn't holler for help. After he pushed
me down, he pulled up my clothes. After he pulled up my
clothes then he unbuttoned his clothes. I still lay there on the
ground. Then after he laid me down and pulled up my clothes
and unbuttoned his clothes, then he got on me. All that time I
had not called for help of any kind; hadn't hollered or screamed
or called for help. Then when he lay down on me he stayed there
about twenty minutes. I didn't call for help during those twenty
minutes. I didn't look to see if I could see my brother or sister.
I didn't look to see if I could see my mother. I didn't look to
see if I could see anybody coming along the road. In the time
he was on me I never called for my brother or sister. I never

called for my mother. I never hollered or screamed. When he got up he went on to the negro house. I went back to where my little sister and stepbrother was. They was down there in the road. While he was on me I never made any effort to keep him from doing what he did. I never scratched him or pushed him or tried to keep him from doing what he was doing to me. I couldn't help it. I was scared to do anything. I couldn't try and keep him from it. I didn't try to keep him from it, because I couldn't; if I could I would. He didn't choke me; he didn't put his hands on my mouth; if I had said anything he would have killed me; he was just mean enough to kill me. I found my sister and stepbrother in the road just a little ways from where I got up. When I went on he went in the opposite direction to the negro house. Me and my stepbrother and sister went back to my mother's house. My mother was there when we got there. It was about ten o'clock in the morning. When I got home I didn't tell my mother anything about it. It was about a half an hour before my stepfather came there; he stayed until nearly dark. Then he went away and didn't spend the night there. During the afternoon I didn't tell my mother; and I didn't tell anybody else. I didn't tell my little sister or stepbrother when I got back to them. When my stepfather went away to spend the night away from home that night, I didn't tell my mother about it, or nobody else that night. He had whipped me about a month or two before that. My mother was present then. I don't know whether she saw him whip me or not. My feelings towards my stepfather are unkind. On Thursday, after Tuesday, I took the sheriff, Mr. Swanson, and the deputy sheriff, Mr. Sanders, to show them where this took place. I showed them the place — they didn't look at the place though. I showed them where he taken me up there. I didn't point out no place; I thought they could look and see. It was about five steps from where they looked — they didn't look all around up in there. I carried them within five steps to where it took place. I didn't show them the very place, I showed them where he taken me there. I don't know whether they looked or not. I didn't show them a place and say this is the place where he laid me down. They asked me to show them the place, and I showed them. As to there not being no sign of any kind where I had been on the

ground, a sign of a track, a mashed place, toe-print, heel-print, knee-print, or anything where anybody had been on the ground, there had been two big rains. As to signs, if they had looked they would have seen it. I told them the place. The signs are there now; if you want to see them go and see for yourself. As to what two big rains had to do with it, there wasn't no tracks there, of course. I showed them the place and thought they would look, but they didn't look. They didn't say nothing. There were prints there if they had looked at them. I carried them to the right place, and [if?] they had looked they would have seen them. The sign that is there now is where somebody has been lying down; where the straw, or grass, was mashed down. I showed them the place. I don't know whether they looked or not. Me and my mother and Mr. Lyons were at this place after the sheriff was there. I have not talked with my mother about what I would swear in this case. She knows. I never told her what I would swear, and she never told me what to swear. I never told her what I would swear. She didn't tell me nothing to swear. I knowed what to swear, of course, when I knowed everything. As to talking with Mr. Bob Brown, the justice of the peace that lives down in the Howell district, I just swore out the warrant; that's all. I did not tell him no when he asked me if it hurt. I did not tell him it didn't hurt much. He asked me if it hurt, and I told him yes. Mama was present then. My mama went with me when I swore out the warrant." Redirect examination: Yes, that is the undergarment I had on at the time this took place. The woods wasn't so thick when this happened. They wasn't big trees; just oak bushes — pretty big oak bushes. You couldn't see far for the bushes. After this happened, Mr. Davis told me not to tell it." Dr. J. M. Strickland, a witness for the State, testified: that he was a practicing physician; and that on September 9 he made a physical examination of the girl's private parts and found a slight laceration of certain parts, rupture of another, and some hemorrhage; the parts were swollen and bruised; based on the injuries he saw, it was his opinion that there had been a "penetration;" that he would not undertake to say it was done by sexual intercourse with a man; it could have been done by other means. R. D. Bryant [Brown?], a witness for the defendant, testified: that he was an ex-officio justice of

the peace; that on September 8, which was the day before the election, the girl came to his place with her mother; that he asked the girl "did he hurt her," and she said, "Not much;" that he asked her if he made any threats, and she said, "No." Lodine Bryant, the sister of Lucile, examined as a witness for the State in rebuttal, testified that Lucile and the defendant were out of sight; neither she nor Joe Brown Davis could see them. Lucile Bryant, recalled for the State, testified that she had not stated to her mother she "would swear anything she wanted me to swear against Mr. Davis." On cross-examination she admitted that she went to school that afternoon and went through her "regular work at school as usual," and went to school the next morning, and did not tell her mother about the occurrence until she came back from school the next day at dinner-time. Her mother was the first person she told about it. In his statement before the jury the defendant denied the charge against him, and stated that "it is a frame-up on me by the girl's mother," that he is 53 years of age, and that "a child of that make up and shape . . couldn't appeal to me" in a lustful manner. The statement further included a long narration as to inharmonious marital relations between his wife and himself, setting out, among other things, infidelity of the wife and a disposition upon her part to get what property he had and cause his imprisonment.

*Clay & Blair* and *Morris & Hawkins,* for plaintiff in error.

*R. A. Denny, attorney-general, John S. Wood, solicitor-general, Graham Wright, asst. atty.-gen., John T. Dorsey,* and *Lindley W. Camp,* contra.

ATKINSON, J. 1. The sole question for consideration is whether the evidence was sufficient to support the verdict finding the defendant guilty of rape. The act of 1918 (Acts 1918, p. 259), making it unlawful for a person to have sexual intercourse with any female child under the age of fourteen (14) years, unless such person shall have previously become lawfully married to such female child, has no relevancy to the case, because the injured female was not "under" the age of 14 years, she being within two months of 15 years of age at the time of the alleged injury.

Rape is the carnal knowledge of a female, forcibly and against her will. Penal Code, § 93. As it involves force upon the part

of the man and unwillingness upon the part of the woman, it differs from fornication, fornication and adultery, or seduction, which latter offenses involve consensual sexual intercouse. The offense of rape therefore cannot coexist with any of the three latter offenses, based on the same sexual act.

In the case of *Jones* v. *State*, 90 *Ga.* 616 (16 S. E. 380), the accused was charged with the offense of seduction. One contention made by the defense was that if the evidence showed any offense it was rape. In reviewing the judgment denying a new trial, this court entered into an elaborate discussion in the course of which it was said that: " Sexual intercourse resulting from seduction must necessarily be committed and accomplished with the consent of the female. This is an essential and indispensable element of this particular crime. Rape, being the carnal knowledge of a female forcibly and against her will, necessarily implies the entire absence of consent on her part. It follows, plainly enough and without argument, that a rape cannot be made the basis of a prosecution for seduction. The two offenses are so totally different, they cannot be confused, nor can one of them by any possibility, legal or otherwise, be substituted for the other. People *v.* Brock (Mich.), 31 N. W. Rep. 585."

In *Mathews* v. *State*, 101 *Ga.* 547 (29 S. E. 424), the girl was 16 years of age. In the course of the opinion it was said by Simmons, C. J.: " Mathews was indicted for the offense of fornication and adultery, and convicted. The facts are set out fully in the official report. It is contended by the accused that under these facts the verdict was contrary to law and the evidence; · that if any crime was committed, according to the testimony, it was rape, and not fornication and adultery. The evidence, in brief, shows that Mathews had employed a girl as his clerk; that she did work for him at her father's house; that he boarded there; that one morning after breakfast, while her father and mother were absent, he and the girl were together in the room of the accused; that he took hold of her person and attempted to throw her upon a lounge; that she resisted; and that he finally ' forced her to consent,' and had sexual intercourse with her. He made no threats; there was no fear or intimidation, and the only violence used, as far as appears in the record, was throwing her upon the lounge. There were no bruises upon her person, her clothing was not torn,

nor did she make any complaint after the act was committed until it was discovered, months thereafter, that she was pregnant. Under this state of facts, if the accused had been indicted for the offense of rape, the jury would not have been authorized to have convicted him. Rape is the carnal knowledge of a female forcibly and against her will; and if she consent to the sexual intercourse, although that consent may be reluctantly given and although there may be some force used to obtain her consent, the offense can not be rape. Although she may have resisted at the time the accused first took hold of her and at the time she was thrown upon the lounge, yet if she consented after this resistance and before the accomplishment of the sexual act, the offense was not rape. In order that the offense might constitute rape, she must have resised with all her power and kept up that resistance as long as she had strength. Opposition to the sexual act by mere words is not sufficient. Any consent of the woman, however reluctant, is fatal to a conviction for rape. The passive policy will not do."

In *Taylor* v. *State,* 110 *Ga.* 150 (35 S. E. 161), it appears that Taylor was convicted of the offense of incestuous adultery alleged to have been committed with his stepdaughter who, as the record of file in this court shows, was 18 years of age. In the course of the opinion it was said by Simmons, C. J.: " In portions of her testimony Miss McGuire stated that she had never consented to the illicit intercourse with Taylor, that in each instance it occurred against her will, and that she was forced to submit to his lustful embraces. Upon this testimony the court was requested in writing to charge the jury that if Taylor had carnal knowledge of Miss McGuire forcibly and against her will, the offense was rape and not incestuous adultery. This request was properly refused; for, taking the testimony of Miss McGuire as a whole, it is obvious that, if her testimony as to the sexual intercourse with the accused is true, she in fact consented to it, so doing however with that reluctance and disinclination·which would naturally be felt by any young girl in sustaining such relations with her mother's husband."

In *Cheney* v. *State,* 109 *Ga.* 503 (35 S. E. 153), the defendant was convicted of rape upon a girl 12 years old. The judgment of the trial court refusing a new trial was reversed, because " The evidence as a whole was entirely insufficient to establish the guilt

of the defendant." In the course of the opinion it was said by Little, J.: "The main witness for the State was the girl upon whom the rape was alleged to have been committed. While in her evidence she makes a statement of facts concerning the assault, amply sufficient to support the charge, she, at the same time, gives such an account of her actions when she was assaulted and while the offense was being committed as entirely negatives the force of her evidence that the plaintiff in error assaulted her. In relating the circumstances under which the assault was committed, she testified, among other things, that on Sunday morning in July, 1899, her father and mother went to church, leaving her two little brothers and her sister, nine years old, with herself at home; that previously to this time she had a conversation with the plaintiff in error, who had told her that he was coming to the house on that Sunday and would bring her a pound of candy; that the accused was near the house when her parents left, and she watched them until they got out of sight; that the accused then came to the house, and caught her by the arm; that she jerked loose and ran up-stairs, and he followed her; that in the room up-stairs he asked her to have intercourse with him; that she refused, and ran down-stairs into a little room, when he caught her, overpowered her, threw her on the floor, and violated her person. Witness resisted and screamed, and told her sister to scream and to tell her brother, who lived near, to come and make the accused leave. Had the witness stopped here, her evidence would have been sufficient to make a prima facie case; but, as her evidence appears in the brief, she further testified that the accused was on top of her for a half an hour; that she had a watch with her, and looked at it when he commenced the intercourse and when he desisted; that during the progress of the assault she laid the watch on the floor by her; and that it was half past ten o'clock when he commenced and eleven when he quit; that she consulted the watch because she desired to know how long it took a man to do that way with a woman; that the house in which the assault occurred was on a public road; that while the accused was committing the act, Mr. Bailey, a white man, passed on the road, and at that particular time the accused had her down on the floor forcing her person. She saw Bailey pass, but did not call to him, because she didn't desire him to see her in that kind of a fix. . . It was

shown that the girl sent for her father and mother immediately after the occurrence, and communicated what had happened; . . it was also shown by the evidence of a physician, who examined her soon afterwards, that penetration of her person had been made. The girl testified that she was twelve years old; and it was also shown that she was of sufficient age and development for the menstrual period to occur."

If the female consent to the sexual intercourse, it is not rape, and she may express her consent by her conduct at the time of the intercourse. Where her conduct is such as to imply assent, no rape is committed, even though the female may verbally proclaim unwillingness to engage in the act of intercourse. Another part of the offense is force upon the part of the accused, exercised against the female. In *Vanderford* v. *State,* 126 *Ga.* 753 (55 S. E. 1025, it was said that " Force is an element of the crime of rape, but it may be exerted not only by physical violence but also by threats of serious bodily harm which overpower the female and cause her to yield against her will." In the course of the opinion this court quoted with approval from Bailey *v.* Commonwealth, 82 Va. 107 [3 Am. St. R. 87], where it was said: " The law requires that the unlawful carnal knowledge shall be against her will. She must resist, and her resistance must not be a mere pretense, but must be in good faith. She must not consent. If she consent before the act, it will not be rape. But as to this consent, we may observe that it must be a consent not controlled and dominated by fear. . . A consent induced by fear of bodily harm or personal violence is no consent; and though a man lay no hands on a woman, yet if by an array of physical force he so overpowers her mind that she dares not resist, he is guilty of rape by having the unlawful intercourse." In considering the question of consent and fear upon the part of the female, it is proper also to take into consideration her age, mental capacity, and relation if any to the accused. In *Simmons* v. *State,* 99 *Ga.* 699 (27 S. E. 755), which occurred prior to the act of 1918, supra, raising the age of consent, the original record in. this court shows that the injured female was a girl eleven years of age. She lived with her father at the residence of the accused at the time of the alleged offense. The defendant was convicted, and this court reversed the judgment refusing a new trial, holding: " The indictment being for

rape, and the evidence as a whole making at best a weak and unsatisfactory case upon the question whether or not the alleged sexual intercourse took place at all, and the evidence relied on to show that it was against the will of the female upon whom the rape is charged to have been committed (even upon the assumption that such intercourse was proved) being by no means clear or conclusive, the ends of justice require another trial." In the course of the opinion by Simmons, Chief Justice, it was said: "The evidence in this case makes at best a weak and unsatisfactory case upon the question whether or not the alleged sexual intercourse took place at all; and if it did take place as alleged, the evidence relied on to show that it was against the will of the female is by no means clear or conclusive. According to her testimony, it took place in the house of the accused, where she and her father boarded. He threw her upon a bed, and she submitted to the connection without any struggle or attempt at physical resistance. She stated that it hurt her, and she cried and told him not to do it, but did nothing further. So far as appears, it was merely because it hurt her that she cried and told him not to do it. It does not appear that she cried out in such manner as would attract the attention of other persons, or that there was any reason to suppose that if she did so she would not be heard. It appears from her testimony that before the alleged intercourse took place she prepared for it by pulling off one of her garments, as the accused had told her to do, and afterwards, the garment having been used in wiping blood from herself and from the accused, she concealed it behind the bed, at his direction. She was a young girl; and if the intercourse took place as alleged, it may have been that she yielded through fear. There was no evidence, however, that such was the case. She did not testify that there was any threat or intimidation or that she was in any degree under the influence of fear; and the conviction cannot be upheld upon a mere assumption that she was. She was of an age at which she was in law capable of consenting to the intercourse; and unless it was accomplished forcibly and against her will, the act was not rape. (Penal Code, § 93.) It is not required that the female shall do more than her age, strength, and the attendant circumstances make it reasonable for her to do in order to manifest her opposition; but it must appear beyond

a reasonable doubt that there was actual resistance, or that resistance was prevented by violence or restrained by fear. Opposition by mere words is not enough. 'Though in words she objects, if she makes no outcry and no resistance, she by her conduct consents, and there is no rape.' 2 Bishop, New Crim. Law, § 1122. A 'mixed' resistance or a merely equivocal submission will not do. There may be slight physical resistance even though there is a mental willingness to submit. Physical pain would naturally produce some manifestation of this kind; or it might be indicative merely of maidenly shame or coyness. As was said by Bronson, J., in the case of The People v. Hulse, 3 Hill (N. Y.), 316: 'Although the woman never said yes, nay more, although she constantly said no, and kept up a decent show of resistance to the last, it may still be that she more than half consented to the ravishment. Her negative may have been so irresolute and undecided, and she may have made such a feeble fight as was calculated to encourage, rather than repel the attack.' See the remarks of Lumpkin, J., on this subject, in *Jones* v. *The State,* 90 *Ga.* 625 (2), et seq. And see also, as to the degree of resistance required to be shown in such cases: 1 Wharton, Crim. Law (8 ed.), § 557; Clark, Crim. Law. § 82, p. 185; 19 Am. & Eng. Enc. of Law, art. Rape, pp. 951, 952."

In the case under consideration, the injured female, being the stepdaughter of the accused was nearly fifteen years of age and over the age of consent, as hereinbefore stated. She appears from her testimony to have been of average intelligence and fully competent to comprehend the nature of the act. Her testimony is set out at length in the statement of facts, and it is unnecessary to repeat it here. It is sufficient to say that she did not, at the time, utter a word of protest or attempt any act of resistance, nor did the accused make any threat or do any act to excite her fears or in any manner prevent her from crying out or making physical resistance, or do anything to prevent her from reporting the matter after the occurrence. Examination of the evidence carries the impression that if the defendant had intercourse with the girl it was entirely consensual. Her testimony that her fear of the accused caused her to remain passive or irresistant, and to fail to report the occurrence earlier than she did, must be weighed in the light of the conduct of herself and the accused and other attendant

circumstances, as testified by her before the jury and stated by her to others after the offense was alleged to have been committed. The girl's conduct was not such as to indicate to the accused that the sexual contact was against her will, or that she was induced thereto on account of fear of the accused, or by any threats of violence made to her by the accused, or other conduct upon his part calculated to produce such fear. Her conduct at the time, as detailed by her, expresses whether she was consenting to the act and whether she was driven to passiveness by fear of the accused and is to be taken in preference to her subsequent statement at the trial, which may have been a matter of afterthought. The evidence was insufficient to support the verdict, and it was error to refuse a new trial.

*Judgment reversed. All the Justices concur, except Beck, P. J., dissenting.*