## WILKIE *v.* THE STATE.

1. The defendant, being on trial for the offense of rape, moved to rule out the following evidence introduced by the State: "I first heard about this charge Monday evening, I reckon about 4 o'clock. I got this information through my wife first. I then had a talk with my daughter. I examined her and saw some wounds on her legs. Since that time I have gone with her and a committee of the grand jury out to Concord Church, where she said this occurred." The motion was based upon the ground that the foregoing evidence was irrelevant and hearsay. The court overruled this motion. This ground fails to specify the name of the witness by whom the testimony was delivered. *Held:* (*a*) A ground of a motion for new trial which recites the overruling of a motion to rule out testimony, but which fails to specify by what witness it was delivered, by reason of which this court would be required to search the entire record in order to properly adjudicate the correctness of such ruling, is too indefinite to present any question for the consideration of the court. *Hunter* v. *State,* 148 *Ga.* 566 (97 S. E. 523) ; *Clare* v. *Drexler,* 152 *Ga.* 419 (6) (110 S. E. 176) ; *Hayes* v. *State,* 18 *Ga. App.* 68 (88 S. E. 752). (*b*) Besides, if this ground of the motion for new trial were complete within itself, some of the evidence was clearly admissible, and the motion to rule out the whole was properly overruled.

2. During the progress of his trial, the defendant moved the court to rule out the following evidence introduced by the State: "I saw a good piece of bark off of a log lying there, knocked off going over there, which she said they knocked off when they were going over the log. She said they knocked it off." The motion to rule out this testimony was based upon the ground that it was hearsay. The name of the witness by whom this testimony was delivered is not given. *Held,* that, for the reason assigned in the first headnote (*a*), no question is presented for decision by this court; but if said ground was sufficient, for the reason stated in said headnote (*b*) the court did not err in refusing to rule out said testimony.

3. During the progress of his trial, the defendant moved the court to rule out the following evidence introduced by the State: "When I got home and told my father about this I showed him the scar on my leg." The grounds of this motion were, that the witness was going into details, that she did not make complaint until one week or longer after the commission of the alleged offense and that it was not a part of the res gestæ, and for that reason was not admissible. *Held,* that the above ruling was not erroneous for any of the reasons assigned.

4. One ground of the motion for new trial alleges that one of the jurors who tried the case and found the defendant guilty was incompetent, because of bias and prejudice against the defendant. An affidavit of this juror was submitted, in which he denied making the statement attributed to him in affidavits submitted by the defendant by which it was sought to establish his bias and prejudice. *Held:* Where in a motion for new trial the impartiality of a juror is attacked and there are a showing and a counter-showing on the subject, and the presiding judge passes on the conflicting evidence, his finding will not be reversed, unless he has abused his discretion. *Embry* v. *State*, 138 *Ga.* 464 (75 S. E. 604). We can not say that the judge abused his discretion in the instant case.

5. The evidence was sufficient to support the verdict.

No. 4613. January 15, 1925.

Rape. Before Judge Park. Jasper superior court. November 1, 1924.

Charlie Wilkie was indicted for the rape of Ophelia McMichael on August 4, 1924. On the trial of the case the following evidence was introduced in behalf of the State:

Ophelia McMichael testified: My father is T. B. McMichael. I am 16 years old. I have an uncle, Tom McMichael, who lives in Jackson. The first time I ever saw Charlie Wilkie was last Friday a week ago. He brought Uncle Tom from Jackson to our house. Uncle Tom stayed at our house until the defendant came back. I went back to Jackson with Uncle Tom and the defendant. When we got to Jackson I went to Uncle Tom's. It was about 8 o'clock Monday when I started back from Jackson over here. The defendant came down to Uncle Tom's house and got me, to bring me over here. We were traveling in a Ford car. The defendant is a married man with two children. He lives right the other side of Jackson. In coming from Jackson down to the ferry on the river nobody was in the car but the defendant and me. When we got on this side of the river and started on the road to the church, he stopped to get out. Before the car stopped he tried to kiss me. I slapped him. The automobile stopped near in front of Concord Church. He stopped about 15 or 20 feet from the church, a little bit out of the road. He got out, ran around, opened the automobile, and pulled me out of the car. When he opened the door he told me to go out there in the woods with him. I told him I was not going to do it. He pulled me out on the ground, and I commenced fighting. He carried me down there. He had me around the shoulder and had my arms locked. He took me 15 yards from the

automobile where this took place. He took me out to a pine place. I tried to get loose, but did not succeed. He got me down on the ground by tripping me up. When he got down he was sitting on me. We scuffled out there about 15 or 20 minutes. He succeeded in having intercourse with me. I was fighting him all the time. There was nobody there at all. Never saw any one passing. When I got up I started to run and he caught me. He said he was a good mind to leave me there; and I told him I didn't care, I would rather be there than in the car with him. He made me get in the car with him. I got back in because he put me in and because I wanted to go home. I did not see anybody then. I did not know where any neighbors up there lived. I had been along there once before, and I had no money. When I got in he got in. On our way to town I said nothing to him and he said nothing to me about this. When we got to town he stopped the car at Goolsby's store. He carried me home. He did not get out and come in the house. We got to Adgate's, where I lived, about 11 o'clock. My mother was there, but I did not tell her about this. She was sick; had heart trouble and is easily excited. She has had this trouble about six years. I told her all about this when she was better. I told my father, after my mother had told him—all about how it happened. They didn't know anything about it until I told them. All this occurred in Jasper County. (Cross-examination) I will be 17 in October. I told my mother Saturday morning. This happened Monday. Nobody was there when I told her. The reason I did not tell her Monday I was afraid it would hurt her. We left Jackson about 8 o'clock to come home. Mrs. McMichael told him she would thank him to carry me back. The defendant tried to kiss me this side of the river. He was driving pretty fast with one hand, and did not turn loose the steering-wheel. He put his hand around my head and tried to pull me over, and I whaled away and slapped him. He got mad and I got mad. He got mad because I slapped him. I hit him hard enough to hurt him. Mama teased me the day I got home about riding with a married man. I told her I didn't know it until I got home. She got after me about it. I was afraid of her health, and would not tell her of this outrage. When he pulled me out I fell in the road. He pulled me up. I tried to knock him off then. It was not long we scrapped there in the road because he carried me on

36

down there. He had me around the waist and shoulders and drug me over a rock. I got away from him first and he tripped me up. I ran as far as from here to that post and tried to get away. He fell down and got up and sat on me. I still struggled. He sat on me about 10 or 15 minutes, I guess. I did not holler or scream. There was not any one around there. I could not make an outcry at all. He was choking me so I could not get my breath. He displaced my clothes. I was too scared to holler.

T. B. McMichael testified: I am the father of Ophelia Mc-Michael. My wife told me her condition on August 4th. My wife's condition was poor last Monday, and the early part of last week. She has heart trouble; she is frail in strength. I first heard of this charge Monday evening about 4 o'clock, through my wife. Then I had a talk with my daughter. I examined her and saw some wounds on her leg. Since, I have gone with her and a committee of the grand jury to Concord Church where she said this occurred. The place was about the distance pointed out by her from the public road. A few trees were there; no underbrush between where they were and the road. I noticed the place on the ground pointed out by her. There had been a couple of rains, and I saw a good little scope of place where there was scuffling. There were dints in the ground and pine straw on the ground. I swore out the warrant for this man. I came up here to swear out the warrant Saturday evening, but could not get the name of the defendant. (Cross-examination) I did not know the condition of my daughter. I had no idea anything had happened. When I came in about dark she was not hysterical, and did not complain of being sore. The scuffling was off a piece from the road. I saw a good piece of bark off a log. She said they went over the log. This bark was tolerably fresh. Tuesday I went out to Concord Church with my daughter. Mr. Jim Burney and Mr. Hawkins went with me. They saw the place I saw. It looked like scuffling.

Ophelia McMichael, recalled, testified: When I got home and told my father, I showed him the scar on my leg. My underclothing were torn and had blood on them when I got home. I showed them to my mama; did not show them to my father. I went out to the place last Monday or Tuesday with my father, and pointed out the place where this occurred. I didn't know who the men were with my father then. There were two of them.

The defendant introduced the following testimony: W. A. Mercer testified: Last Monday a week ago I recall seeing the defendant and Ophelia McMichael together. I was going to the post-office, and they overtook me near the edge of Burney's house. I was going home. They asked me if I wanted to ride. I said: "You are sort of loaded; I will walk on." They said: "Get in;" and I hung on the running-board. I have known Miss Ophelia Mc-Michael a number of years. I did not notice anything strange about her appearance that day. She did not have much to say. I did not notice her clothes being dusty or muddy. I didn't notice that she looked and talked as if she was her usual self. (Cross-examination) She has always borne a good reputation in her community. She was looked on as one of the nicest girls in the community. I rode about 200 yards. I asked her how she liked Jackson, and she said she didn't like it much. I didn't notice her being in any way distressed.

Ira Goolsby testified: I know Ophelia McMichael and Charlie Wilkie. I saw them together last Monday a week ago, at my meat market. I was standing in the door, and a car was standing sort of off to one part of the street. Heard somebody laugh. I saw it was Wilkie. Miss Ophelia was with him. Her appearance was jolly like, some laughing. She appeared happy and well pleased. (Cross-examination) I used to live at Adgate's, and knew this girl, and never heard anything wrong about her in my life, and as far as I know she bore a good reputation. I could swear the girl laughed.

Ankers Avery testified: I lived at Adgatesville about two months, and have known Miss Ophelia McMichael about two months. I have gone with her. Her reputation for virtue and chastity is pretty bad. Took a ride with her last Friday night. Houston McMichael and her sister were with us. (Cross-examination) I came from Jones County. I came from Mitchell County to Jones; stayed about two years in Mitchell, and came from Houston County to Mitchell. I lived in Jones before I got to Houston. Am a sawmillman; just here, there, and everywhere.

L. O. Goolsby testified: I live in Monticello, and lived in Griffin before I moved to Monticello, and before that I lived at Adgatesville. Lived there about three years. Have known Ophelia McMichael about three years. Know Charlie Wilkie, and saw him

and Miss McMichael together August 4th the first time. They stopped at the market and left some bread. I was standing in the door, and she hollered "Hello," and I said: "Look here, what are you doing here?" and she said: "I have been over at Jackson taking a vacation." She seemed to be happy. ·Her clothes were not disarranged, dirty or torn. (Cross-examination) I never specially noticed her clothes.

The defendant made the following statement: I am a married man with two children. I have been taking bread over here four or five years. Last Friday at Jackson Mr. Tom McMichael asked me if he could come over to visit his brother. I told him I had room for him. I brought him over here, and he got out there at his brother's beyond Adgatesville, not very far. I let him get out. I got through and went back and got him. Miss Ophelia got in the front seat with me, and he and a little chap got in the back. We went right on to Jackson. That Monday morning I came by the house to see if she was gone, and she was on the porch with her uncle's wife and his daughter and another girl, I think. They came out to the car and said good-bye, and she got in the car and I drove on and stopped at White's store and sold him some bread. Was there five or ten minutes, and drove on to the ferry, crossed, came on up the hill, and was making 20 or 25 miles an hour when I got to the top. Never slowed up anywhere. Stopped at Stone's store. Was there about 10 minutes, and went down to Goolsby's market and went in and changed some bread. I drove to the store this side of the crossing. I carried the young lady on home. That is all I know about this. I was never more surprised at anything in my life when I heard of it. I never dreampt of doing such a thing. I wouldn't. I was not entitled to do it on the public road like that, and in sight of a house where people were living. There is a negro house there. A few yards further there is a family of white people. People are passing there all the time.

The jury found the defendant guilty, recommended mercy, and fixed his maximum term at five years and his minimum term at one year. The trial was on August 14, 1924. The defendant moved for a new trial on the general grounds. By an amendment he added some special grounds. Other pertinent facts appear in the headnotes.

*William H. Key,* for plaintiff in error.

*George M. Napier, attorney-general, Doyle Campbell, solicitor-general, T. R. Gress, assistant attorney-general,* and *A. Y. Clement,.* contra.

HINES, J. (After stating the foregoing facts.) None of the headnotes require elaboration, except the last. It is earnestly insisted by counsel for the defendant that the verdict is without evidence to support it. We are not prepared to say that this contention is well founded, and that a new trial should be granted because the conviction is unwarranted by the evidence. We recognize that there is great danger that injustice may be done a defendant in cases of this kind. The people of a community are apt to be wrought up to a high pitch of indignation by the heinousness of this offense. The popular mind becomes excited. The anger is contagious. It may invade the jury-box. If it does, it may displace that calm and judicial temperament which should rule a jury in reaching a just verdict. It may follow that great wrong may be done an unfortunate defendant. For this reason courts of review, while reluctant to disturb a verdict where there is any evidence to support it, frequently set aside verdicts in this class of cases, even though supported by the positive and direct evidence of the female, where the countervailing circumstances make a weak and unsatisfactory case. *Simmons* v. *State,* 99 *Ga.* 699 (27 S. E. 755) ; *Davis* v. *State,* 152 *Ga.* 320 (110 S. E. 18).

The female alleged to have been outraged made no outcry at the time the offense was committed. She explains this by the fact that she was being choked by the defendant, and by the further fact that she was so frightened that she was unable to make an outcry. When she reached her home she did not immediately make complaint to her mother, but waited from Monday until Saturday to do so. She explains this by the fact that her mother had been suffering from heart disease for a number of years, that her disease was worse when she got home, and that she was afraid the disclosure of this outrage would aggravate the trouble, or possibly produce the death of her mother. On the following Saturday, she says, her mother was better, and she then told her about this affair. There seems to be no reason why she would tell her mother on Saturday, rather than on Monday, except that given by her. This offense was alleged to have been committed near a public road, near a church, and in sight of two residences. It is insisted that under these

circumstances the defendant would not have attempted to commit rape upon the person of this girl. It is not shown that any persons were passing on the public road, or that any persons were near the scene, or, if there were, that the defendant and the girl could have been seen by them. The above circumstances were matters to be considered by the jury in determining the weight and credit to be given the testimony of the victim of this alleged rape. The female was a girl between 16 and 17 years of age. She was traveling alone with the defendant from the home of her uncle to the home of her parents. Two of the witnesses for the defendant testified to her good fame. One of his witnesses, a strolling character, testified that her reputation for chastity was bad. This conflict was one to be settled by the jury. There were bruises upon her person. These were testified to by her father. She went with her father to the place of the alleged offense, and pointed it out to him. He testified to indications of a considerable struggle there. Her testimony is direct and positive that the defendant committed this offense upon her person. She is corroborated by circumstances. A jury of the vicinage found the defendant guilty. The trial judge approved the verdict. Even though it may not be entirely satisfactory to us, we do not feel justified in setting it aside on the ground that it was unwarranted by the evidence. The credit of the female alleged to have been outraged was for the jury. We do not feel authorized to interfere.

*Judgment affirmed. All the Justices concur.*