BELMONT, *alias* SMITH, *v.* THE STATE.

No. 8766. MARCH 16, 1932. REHEARING DENIED JULY 16, 1932.

*Linton S. James* and *H. W. McLarty,* for plaintiff in error.

*George M. Napier,* attorney-general, *John A. Boykin,* solicitor-general, *T. R. Gress,* assistant attorney-general, and *J. W. LeCraw,* contra.

HINES, J.   Jack Belmont, alias Robert B. Smith, was indicted for the rape of a girl between the ages of 16 and 17 years.   He was tried and found guilty, the jury recommending mercy and fixing his punishment at 3 to 5 years.   His motion for new trial was overruled, and he excepted.   On the trial these facts were shown in the evidence for the State:   The alleged victim lived with her parents. She was not in the habit of going with boys.   She had had very few "dates" in her life.   On Friday afternoon, on the porch at the home of a schoolmate, she met the defendant.   After talking awhile, the defendant asked her if he could have a date with her for the next night, saying that they might go to a show and to a dance afterwards.   She told him that she would have to ask her mother, and he said he would telephone her that night to see if she could go. When he telephoned, she told him that her mother would not let

her go to a dance with him, but that she could go to a show. He then agreed to take her to the Fox theater. On Saturday night the defendant called at the home of her parents, and was introduced to her mother and older sister. He declared in their presence that they were going to the Fox theater. She said "Bye bye, mother," and went with him, catching a street-car in front of the house. The defendant then took her down town on the street-car, and soon started talking about wanting to go to a dance instead of the theater. She told him that she didn't want to go to a dance, as she had told her mother she was going to the theater. He insisted, and she kept telling him she must go to the show, and that she had told her mother they were going there. He said he would have her back by 10 o'clock, and that then they could go to a show. He then took her to a Lakewood street-car. When they got on the street-car she told him she didn't want to go to Lakewood. He told her if she made any outcry the police would get her. He kept threatening her. She allowed the defendant to talk her into going with him to Lakewood. Out there they stayed at the dance a little while. The defendant began talking about a proposition of installing some kind of a drink-stand out there, and pointed to a man walking down the road in the fair-grounds, and said he wanted to see that man about the proposition. The man started walking off down the road and defendant kept following him and pulling the girl along. They walked along following this man about 500 yards, beyond where the road was closed. There was a plank across the road. It was blocked, and the girl didn't see any one. They walked beyond where the road was blocked. Finally they got to the landing at Lakewood where they load trains and cars, and there was a railroad-track there. The landing was beside that. It was about four feet high from the ground.

The girl gave this account of what then took place: "What happened there, I kept pulling back and told him I wanted to go home. He had hold of me, and he jumped off of this landing and got hold of my foot. To keep him from pulling me off I jumped off. I kept telling him I wanted him to take me back home. When he got me down there a little ways, down under this landing, down this railroad-track by this landing, he still had hold of my hand, and he went underneath there and pulled me under. When he got me underneath there he threw me down on the ground and tried to

choke me, and I thought he was trying to kill me. I didn't want him to do anything to me. He then held my hand; that was the first time he committed the act against my person. He had intercourse with me. I suppose it was about an hour he kept me down them. I was using my hands and struggling, and my watch came off, and I broke my compact; and I don't know whether it was there I lost the set out of my ring, or the second place, but I lost it. I got my back hurt there with a piece of iron, where he threw me down on the ground, had me down on a piece of iron. I felt it; it was on the ground under that platform, under the railroad-track; that was the time I felt that in my back. I never consented for him to do that act with me. I tried to resist all the way through. I tried so hard till I fainted. I was not near any one as I knew of. Nobody was around there during that period as I know of. I did not scream. I was afraid to scream. I think he kept me down there about an hour. He hurt me. When he kept struggling with me he hurt me, he bruised me, and hurt me in my back where his finger-nails pressed in my back. He hurt me other ways; he hurt my privates; he hurt me there. I had never gone through that act with any man before, never had. I was sixteen then. I am seventeen years old now. . . We left that place. I guess he finally got through, and came on out, and he went on back then and got my watch and got my compact. He went back underneath there and found my watch. We walked the railroad-track to the road, and I tried to get out the gate to go home. He says, 'If you go back up there the police will arrest you, you will be in trouble,' and he pulled me back towards the Pryor Street road. We went up there and were almost to the gate, and he says, 'Let us go over there and sit down. I am so hot I don't know what I am doing.' I says, 'I am not hot,' and he saw a path and went down the bank, a pathway behind those signs, and he pulled me down behind the signs; and that was the second place, I mean the second he had intercourse with me, and he did the same thing to me there he did at the first place, and he kept me there at this second place about as long as he did at the first one, . . and he hurt me there at the second place. When he pressed on me he hurt me. When he pressed himself up against me he bruised me. He hit me and bruised me. He hit me during the time between the first and second place, between the first and second time this happened, he slapped me in the face. He

slapped me in the face with the open palm of his hand. . . I said he hurt me at this second place. He just did. I don't know how he did it. I resisted him there as much as I could. I thought he was trying to kill me again, but I was too weak then to fight him. He finally got through there. Then we went to that gate; when we got there we found it was locked, and then we had to go back over to the other side, to the buildings where the rodeo-show was kept, where a lot of people stayed. He decided there he wanted some water, and we went down to the barn and got some water and washed my face, or tried to; and then this party he saw there let us out the gate by the barns; and then we were out to the road, and then we started up the road, and it was too late to get a car; and then he said we would walk about a mile up the road and catch a taxi. We kept walking and finally got up there, and I was just so sick when we got up there I didn't know what I was doing, and there was a gipsy woman there who gave me some ammonia. I talked to the gipsy woman there. I told her I was sick. She asked me what made me sick. I couldn't tell her like I told you. I told her I was sick at my stomach. I felt like I was going to faint, and she gave me some ammonia. I didn't drink anything else there. She put it out before me, and I waited a few minutes, but I was too sick to take it. We stayed at that place about fifteen or twenty minutes. Then he asked the man if he could get a way for us to get home, and he said he closed the place about two o'clock in the morning and then he would take us home. We then walked up to the next place and tried to get a taxi. We kept walking by places and then went into a negro place to get some ice water, and he went off again and talked to a negro man. I don't know what he said there. We then went up the road and got to a trestle; it was the Atlanta & West Point, I think; . . it goes under the railroad-tracks. We went under there and went up the street a little piece and went around the corner, and he says, 'Let us go around and sit down,' and I kept telling him I wanted to get home. I knew I was not in the right street; we were in the road, along there, and he pulled me down to this third place. He kept pulling me down there, and finally he got me down there, I guess about fifty yards from the road, and there we got in some barbed wire and he threw me upon the ground again, and that was the third time. We were in sight of the road, but there were trees there. He kept me in

this third place about a half hour. At this place he committed the same thing against me, he had intercourse with me there again, and after that time he was trying to make me promise I would not tell anything if anything happened to us, and I wouldn't, and he slapped me, and he slapped the left side of my face and pushed me up against a tree. He intercoursed with me there at that place; that was the third time. I was too weak to resist him, and all I could do was to beg him to leave me alone, and take me home. I refused to do what he asked me to do. He hurt me on this third occasion. . . Then, after this third place, we walked up the road a little piece, and the police car come up and stopped, and asked us what we were doing. I was too sick, I don't know what I said. I don't recollect anything."

She was taken by the police to the home of her parents, arriving there between two and two-thirty in the morning. When she arrived at home, her mother testified that she was as white as she could be, and was trembling. Her mother asked the defendant where they had been, and he replied "Lakewood." The girl said, "I am sick." The police let her out of the car, and she took hold of her mother's arm. The mother took the girl by the arm and started up the steps, and the girl said, "Mother, he got me." When asked by the mother why he did not bring her daughter home, the defendant replied, "I am awfully sorry it happened." The mother took the girl to her room, took off her clothes, found her back bruised and bleeding from a place on her right shoulder, and there were some red marks; the underskirt attached to the girl's dress had a spot of blood on it, and her underwear was filled with blood. She then gave her further details about the matter; and the mother made complaint. She called in Dr. Ballenger that night about four o'clock. She and her husband were present when the doctor made the examination. The girl was bruised, torn, and lacerated on the outside. Her organs were red, irritated, and there were streaks of blood. She was confined to her bed from Sunday morning until Thursday, except when she was taken to the police court on Tuesday. X-rays were taken of the girl's head by Dr. Godwin. Her jaw and her eyes were swollen. Her mouth was so swollen that her mother had to feed her two days with a tube.

The two policemen who met the defendant and the girl on the night referred to testified in substance as follows: They came

across the defendant and the girl on Pryor Street, where it runs under the belt-line railroad, out towards Lakewood. It was between two and two-thirty in the morning of June 7. They were coming along Pryor Street towards the city. The police drove up beside them, stopped, and asked them why they were out so late. The defendant said that they had been to Lakewood and got lost. They then took the defendant and the girl up and brought them to the home of her parents. Just before they got to Stewart Avenue the defendant asked the policemen to let them get out before they got to the house. This was not permitted. When they were in front of the house of the girl's parents, the mother came out. The girl said she had been sick. The mother asked her why she had been out so late, and told her to come into the house. They decided to go to the police station, and carried the defendant down there and locked him up. He gave his name as Jack Belmont. When the defendant and the girl were walking along that road their arms were linked together. At the time they were picked up, the girl made no complaint to the policemen. She did not say that she had been raped. The girl testified that she did not complain to the police officers who picked them up that the defendant had outraged her. She gave as her reason that she did not want to tell everybody. She did not tell the gipsy woman anything about what he had done to her. She wanted to tell her mother first, and didn't want everybody to know.

Dr. Ballenger testified that he was called to see the girl about four-thirty in the morning, that there were bruises on her back and limbs, that she was very nervous, that he found a slight laceration or tear in the posterior part of the vagina, but no other tear.

An unused rubber "cundum" and a broken compact-chain were found at the scene of the alleged rape.

Fred Mitchell testified that he saw the defendant and this girl about twelve-thirty o'clock on the night of the alleged rape, at a barbecue stand. He saw them there about fifteen minutes. He saw them leave the place; they went up the road together. There were other people in the stand at that time. Charley Morgan and Mrs. Farley were there. The girl did not make any complaint to him or Mrs. Farley that she had been mistreated in any way. There was nothing about her person that attracted his attention. If her clothing had been disarranged he could have seen it. While he was

there the defendant and the girl were talking to each other. Charley Morgan testified that on June 6 and 7, 1931, he was working at Farley's barbecue stand on Pryor Street. He there saw the defendant and this girl. There was no conversation between them at the time. He asked the girl if she wanted a sandwich, and she refused. The defendant asked if she wanted a drink of anything, and she said she did not. Mrs. Farley did not prepare any ammonia or anything of that kind for her. The girl was rubbing her face, and said she was subject to fainting spells, and that was the reason Mrs. Farley gave her something. Mrs. Farley offered, if they would wait about thirty minutes, to carry them home; and they refused. The girl's response was "Hell no."

The defendant made a statement in which he admitted having had, on the night in question, intercourse at three different times and at different places with the girl, but he stated that all three times the intercourse was had with her free and full consent. He entered into details touching his acts, all tending to show that she consented for him to have intercourse with her.

■ The court charged the jury as follows: "Now, gentlemen, this defendant is charged in this indictment with the offense of rape, and in the trial of this case there has been testimony as to three different transactions which are alleged to have taken place between this defendant and Edna Mae Printup. If you find this defendant guilty of the offense of rape, you will find him guilty on the first offense in which there was sexual intercourse, if you believe there was sexual intercourse, between these parties. Testimony as to the other offenses, if there be such, has been admitted for the purpose of illustrating motive, intent, good or bad faith, and to show the state of mind of the defendant as to the crime for which he is now being tried. The defendant is on trial for the particular offense charged against him in the bill of indictment; and this, as I have said, is the first offense, if you believe there was such offense, and you would not be authorized to convict him of any other offense or offenses. Where knowledge, motive, intent, good or bad faith, and other matters dependent upon a person's state of mind, are involved as a material element in a particular criminal offense for which a defendant is on trial, evidence of the defendant's conduct with reference to similar transactions about the same time is admissible for the consideration of the jury in so far only as they may tend to

illustrate, if they do, the state of the defendant's mind on the subject involved. So, in considering this case, whether or not the defendant is guilty of the offense of rape at the time of the first sexual intercourse, if you believe there was such, you will take into consideration the other occasions which have been testified about, for the purpose only of illustrating, if they do, the state of mind of the parties at the time this first offense was committed, if you believe there was any offense committed, under the instructions given you. Now this defendant, as I have called your attention, is charged with the offense of rape, in that it is alleged he, in the County of Fulton and State of Georgia, on the 6th day of June, 1931, did have carnal knowledge and sexual intercourse with Edna Mae Printup, a female, forcibly and against her will, contrary to the laws of the State." To this instruction the defendant excepted upon the ground that it was an expression of opinion by the court upon the evidence, and conveyed to the mind of the jury an intimation as to the acts of the defendant which the jury could consider in passing upon his guilt of the offense charged. The defendant again excepts to the charge just set out, on the ground that it was not warranted by the evidence, and was without evidence to support it. In the light of the evidence already quoted, he excepts to said instruction, upon the grounds that (1) it was an invasion of the jury's right to consider the positive sworn evidence, and such invasion was prejudicial to his rights; (2) it took from the jury the right to consider positive sworn testimony in the case, and was an invasion of the defendant's constitutional right which provides that he shall not be deprived of life, liberty, or property, or the pursuit of happiness, without due process of law; (3) it was a positive expression of the belief of the trial court. Also, (4) the court committed error in withdrawing from the jury the two acts as positively sworn to by the prosecutrix, when there was at no time any intimation on the part of the State's attorney that the State rested its case upon the first act alleged to have been committed by him, and that the other two acts would be taken into consideration solely for the purpose of illustration; and (5) his counsel had no way to defend him against said private election by the State in the event the State did elect to proceed on one act alone.

Unquestionably "It is error for the judge of the superior court in any case, during its progress, or in his charge to the jury, to ex-

press or intimate his opinion as to what has or has not been proved, or as to the guilt of the accused; and a violation of" this principle must be held by this court to be error, and the judgment in a case, in which such error occurs, must be reversed, and a new trial granted with such directions as this court may lawfully give. Penal Code, § 1058. The instruction complained of did not in any way express or intimate any opinion as to what had or had not been proved. It was a direction to the jury that they could not find the defendant guilty under all the facts in proof relating to the second and third acts of intercourse between him and the female alleged to have been outraged. The defendant stated to the jury that on this night he had, at different places and at intervals, intercourse three times with the female alleged to have been raped by him. So this instruction did not assume any fact which had not been proved. The three acts of sexual intercourse by the parties were fully admitted by the defendant in his statement. This instruction did not express or intimate any opinion as to the guilt of the accused. On the contrary it was an instruction that the jury, if they found the defendant guilty, could not find him guilty except as to the first act of sexual intercourse between the parties, and that they could not find him guilty of rape under the two succeeding acts of sexual intercourse between them. The court in no way intimated that the jury could find him guilty from the facts appearing as to the first act of sexual intercourse. On the contrary the judge left to the jury the question of his guilt growing out of the first act of sexual intercourse, and instructed them, if they found him guilty at all, that it could only be under the facts relating to the first act of sexual intercourse between him and the female.

But it is insisted that the defendant was entitled to have the jury pass upon his guilt or inocence under the facts relating to the second and third acts of sexual intercourse. The court distinctly instructed the jury that they could not find him guilty under the facts relating to the second and third acts of sexual intercourse. This was favorable to the defendant. It shielded him from conviction under the facts relating to the second and third acts of intercourse between him and the female. Under this charge the judge in effect instructed the jury that there was no evidence which would authorize them to find the defendant guilty under the facts touching the second and third acts of intercourse. This instruction might

have been error so far as the State is concerned; but it was not an error against the defendant. If erroneous, it was in favor of the defendant and in consequence was harmless. *Fair* v. *State,* 171 *Ga.* 112, 120 (155 S. E. 329). For this reason, the contention of the defendant that the jury should have been left to pass upon his guilt or innocence under the facts relating to the second and third acts of sexual intercourse is not well founded; and the instruction of the court upon this subject, which was favorable and not harmful to the defendant, does not require the grant of a new trial.

But it is insisted that a new trial should be granted upon the general ground that the testimony of the female was not corroborated by other evidence or circumstances. Conceding that the testimony of the female alleged to have been raped should be corroborated, upon which question the members of this court are not agreed, there were sufficient facts and circumstances in the case to corroborate her testimony. Again, it is urged that the facts and circumstances were such as to discredit her testimony, and that for this reason it should be held by this court to be insufficient to sustain a verdict of guilty. There are cases in which courts of review, while generally reluctant to disturb a verdict where there is any evidence to support it, sometimes set aside a verdict in a case of this character, even though supported by positive and direct evidence, where the evidence as a whole makes at best a weak and unsatisfactory case upon the question of whether or not the alleged intercourse took place at all, and where the evidence relied on to show that it was against the will of the female upon whom the rape is charged to have been committed is by no means clear or conclusive. *Simmons* v. *State,* 99 *Ga.* 699, 703 (27 S. E. 755); *Davis* v. *State,* 152 *Ga.* 320 (110 S. E. 18). The case at bar does not come within these cases. We think that the evidence authorized the jury to find the defendant guilty.

*Judgment affirmed. All the Justices concur.*