## SLAUGHTER *v*. THE STATE.

No. 10541. MAY 18, 1935. ADHERED TO ON REHEARING, SEPTEMBER 11, 1935.

*Love & Fort, R. Terry, A. L. Hardy, T. C. Denmark,* and *George C. Palmer,* for plaintiff in error.

*M. J. Yeomans, attorney-general, A. J. Perryman, solicitor-general, B. D. Murphy, J. T. Goree,* and *G. W. Huling,* contra.

HUTCHESON, Justice. Robert Slaughter was convicted of the offense of rape. His motion for new trial was overruled, and he excepted.

The rules of evidence in rape cases are, in some particulars, different from those applicable in other cases. The crime is generally in secret, and there is consequently an absence of direct testimony. The prosecutrix is allowed to give testimony under oath, and it is a wise provision of our law which says that such testimony is not sufficient to warrant a conviction unless it is corroborated by facts and circumstances in connection therewith. The question of guilt or innocence in a case of this character must be determined by the weight, and not the character of the proof. In the case of *Innis* v. *State, 42 Ga.* 473, it was aptly said by Lochrane, C. J.: "While it is the duty of courts to protect female chastity by every protection of the rules of law, still, in cases of this character, care should be taken not to sacrifice justice to sentiment."

Let us look for a moment at some of the testimony of the prosecutrix in this case. She testified as follows: "I know Robert Slaughter. I am twenty-four years old. I met the defendant a week ago at Florine Robinson's. Gene Hale was with him at the time. We all rode around, and they suggested that we go out to Ada's place, and I asked who Ada was, and they said, 'We will go out there and get a bottle of beer.' They said I hadn't been living here long enough to know who Ada was. I told them I had never been out there. So we went out to Ada's and drunk a bottle of beer, and we all set in the little room and stayed there a little while. Gene, Florine, and the defendant were present, and we left there and rode around. . . Then we went up to that club. . .

We drank a bottle of beer and then went out to this other place. I will say we stayed there an hour or a little over. We drank a bottle of beer and ate something out there, and then rode around some more and went home." On cross-examination, she testified that they went to a vacant negro cabin, that Florine Robinson and her date got out of the car and went around the side of the house, and that they stayed there thirty or forty minutes. She further testified that the defendant made a date with her for the next night (Monday); and that on Monday night he came for her in his car. She then testified as follows: "He stopped right below the drug-store there that night and asked the boy to bring him a lime-sour and an extra glass, and he had some whisky in the car—about that much, and he brought it and another glass, and he insisted on me drinking, and I told him I didn't want it, and he insisted on me drinking, and I did, and he poured him out a very small amount and he drank some. That was right under the bright lights, and he wasn't threatening me. He insisted on me drinking it. There was nothing to compel me to drink it. That was my first drink of liquor. I haven't drunk liquor before. I have tasted it. I tasted it at different times; not on different occasions. I never had drunk liquor before. I had tasted it. I never had tasted it over once or twice. I don't know when that was. I have no idea when it was. I don't remember whether it was one year or ten years ago. I have been drinking beer just this year; nobody had to insist on me doing that. I never drank very much beer. I did drink it voluntarily. He poured out about one joint on my first finger and I finally drank it. I took a chaser. I didn't know what a chaser was for. He handed it to me and told me to drink it, and I told him it burned. I told him it was burning, and he handed me a glass and told me to take a swallow of that. He had to pilot me all the way through. I had never seen men drink like that. I had never seen any ladies drink liquor and take chasers. I had never been out and seen anybody drink like that. I said I lived in Atlanta about six years, and I went with the young set up there some. I never saw anybody drink liquor until Bob Slaughter showed me how that night."

She then testified about his driving to a certain roadhouse, and said, "We stopped in front of the filling-station. The lights were burning. The lights from the filling-station and store were

shining out. We stopped out there, and a tall man came out, and we asked him for sandwiches. Mr. Slaughter didn't say, 'We want a sandwich.' The tall man didn't call his wife. His wife didn't come out and bring a book. I didn't see a book. I never saw a woman there either. I never did see a woman around that place. I did not see him write his name in there, 'Mr. and Mrs.' I didn't see him, and he didn't do it out there. He went straight on to the cottage with me. . . It was then around ten o'clock, I am not sure, and that station was wide open and all lighted up and everything running just like business. When the sandwiches come out Mr. Slaughter said, 'We will go up to the cottage.' I objected to that; he drove off anyway. I didn't try to get out of the car; I didn't tell him to let me out. I told him not to go up there, that I had to go home. When he went on anyway he was still in the light, and there was a light in the cottage then. . . I did not utter a word of objection about getting out of the car. I went in the door voluntarily. I was in full protection of the light. I didn't have to get out of the car and cross over and go in the cottage door. I stepped right out of the car door in this little cottage. I did it voluntarily. I sat down voluntarily, and I ate voluntarily. When I saw the bed in there I didn't raise any objection. I didn't ask him what it was for. I didn't ask him what he intended to do with me. I sat down quietly and ate my sandwich. . . He did not play with me while I ate my sandwich. . . There is a window; it is a little bitty place. The window didn't have any glasses in it. . . The door was locked. He locked the door. He didn't have a key; there was a button, great big button on it. . . I never tried to call anybody through that window. I never pulled back toward the door. I never pulled over toward the window. . . I was screaming to him. I was trying to get help from the outside. I saw the cars there. The cars were there when we went up there. I didn't see anybody but Mr. Slaughter. I couldn't try to look for anybody else. How could I pull toward the window when he had me down? He knocked me over on the bed. He grabbed me out of the chair, the first thing he did. I didn't pull to the door while he was grabbing me and pulling me up. I didn't pull to the window. He knocked me over on the bed. . . He tore my dress when he was trying to pull it off. He tried to pull it off first. I resisted. I didn't have on my dress; to save

my sister's dress I pulled it off myself. ˉ . . I pulled my dress off afterwards. I stood before him without any dress on to save my sister's dress. I had on a brassiere. . . I didn't have to pin up my brassiere or my slip before I got home, nor my bloomers. I didn't have to pin up anything. All of my clothes stayed on without mending them before I left the cottage. . . I had on this slip here that night. That was pulled off of me, and my step-ins too, and my body was entirely nude. How could I try to get out at the door in that condition when he had me down. I didn't try to do that. . . I think it took him around two hours to ravish me. I got home about 12 o'clock; he started on me around 10 o'clock. . . Two towels were used in there; he used one and I used one. I don't remember whether he got dressed before I did or not. Certainly, I dressed hurriedly. I don't remember whether anybody was at the filling-station when we came out or not. I didn't look. I didn't look to see if there was anybody to complain to. I didn't see anybody. He stopped somewhere that night, and said he would get two coca-colas and maybe I would feel better. . . I didn't object when he said, 'We will go and get a coca-cola.' . . We sat there around that drink-stand a very few minutes. I didn't fuss at him there. I didn't say anything to him when I got home. I didn't tell him I was going to tell on him." Later in her testimony, in referring to the time she told her sister, she said, "I had had a little infection,. and that was hurting me. . . When she made me tell her, I told her that a man had ravished me."

The use of force is a necessary element to the crime of rape, and without it there can be no such crime. If there be consent upon the part of the woman, an essential part of the crime of rape is destroyed; and such consent need not be evidenced by words, but may be shown by mere passiveness or failure to exert every possible means to prevent the act. In *Jones* v. *State,* 90 *Ga.* 616 (16 S. E. 380), it was said that "in the famous speech of the great Erskine, in Howard *v.* Bingham, he drew a picture of 'a charming woman, endeavoring to conceal sensations which modesty forbids the sex, however enamoured, too openly to reveal,—wishing beyond adequate expression what she must not even attempt to express, and seemingly resisting what she burns to enjoy.' That a woman exhibits hesitation, reluctance, and a slight degree of

physical resistance does not, by any means, make the intercourse, when accomplished, rape." In the case at bar, according to the testimony of the prosecutrix, she went to certain roadhouses with the defendant, where drinks were being served, on Sunday night. She sat quietly with him in the car while the other two young people retired to a vacant negro house and remained there for thirty or forty minutes; and knowing the character of the places she had visited, she returned with him on Monday night, she went with him to this cottage voluntarily, she knew the door was latched, she pulled off her dress and stood before him, saying she did so because the dress belonged to her sister and she didn't want it torn; she knew there were cars and people at the filling-station, only a short distance away, yet she did not call to them or raise an outcry loud enough to be heard by them; she made no effort to reach the door or window, and in one part of her testimony she says that she made no such effort because she was in a nude condition. Would she not, in order to protect her virtue, have, like Lady Godiva of old, gone through the streets, if necessary, clad only in the garb furnished her by nature? It is true that she did say that the act was consummated by means of force and violence; but other parts of her testimony, detailing the facts and circumstances, demand a finding that she knew what was intended by the defendant and yielded to his wishes, and only reported the same three days later when she was made to do so. The question of age of consent does not enter into this case, as the young woman gave her age as twenty-four.

In *Davis* v. *State, 152 Ga.* 320, 327 (110 S. E. 18), it was said: "If she consent to the sexual intercourse, although that consent may be reluctantly given and although there may be some force used to obtain her consent, the offense can not be rape. Although she may have resisted at the time the accused first took hold of her and at the time she was thrown upon the lounge, yet if she consented after this resistance and before the accomplishment of the sexual act, the offense was not rape. In order that the offense might constitute rape, she must have resisted with all her power and kept up that resistance as long as she had strength. Opposition to the sexual act by mere words is not sufficient. Any consent of the woman, however reluctant, is fatal to a conviction for rape. The passive policy will not do." In *Patton* v. *State,*

117 *Ga.* 230 (43 S. E. 533), it was held: "The law recognizes that there may be evidence pointing to guilt, without that evidence being sufficient to warrant conviction. In testing the sufficiency of evidence, this court can not consider the credibility of witnesses, but it may consider the nature of the testimony, and whether or not it should be treated as incredible because purporting to prove facts impossible. Courts and juries are not bound to believe testimony as to facts incredible, impossible, or inherently improbable. Great physical laws of the universe are witnesses in each case, which can not be impeached by man, even though speaking under the sanction of an oath." The remarks of Chief Justice Simmons in *Simmons* v. *State,* 99 *Ga.* 699, 703 (27 S. E. 755), seem peculiarly appropriate to the instant case, and are quoted as follows: "It is held that in such cases the testimony of the person alleged to have been raped should always be scrutinized with care; and when there is much in the facts and circumstances in evidence to discredit her testimony, it should be deemed insufficient to sustain a verdict of guilty; and hence it is that courts of review, while generally reluctant to disturb a verdict where there is any evidence to support it, frequently set aside verdicts in cases of this character, even though supported by positive and direct evidence." Directly applicable to this case is the language used in *Peters* v. *State,* 177 *Ga.* 772, 775 (171 S. E. 266): "The accused admitted that he had sexual intercourse with the complaining woman, but he asserted that it was done with her consent. The evidence against the accused, if believed, would support the verdict. However, it is of such extraordinary character that it bears the earmark of the unbelievable."

The evidence does not measure up to the requirements in cases of this character, and is insufficient to support the verdict.

*Judgment reversed. All the Justices concur, except Russell, C. J., and Bell, J., who dissent.*

GILBERT, Justice, concurring specially. I concur in the judgment of reversal, but can not concur in some of the reasons assigned in the opinion. It is unnecessary to discuss the principles from which I dissent, as has been done in several cases heretofore. Among such rulings is that the testimony of the injured female "is not sufficient to warrant a conviction unless it is corroborated by facts and circumstances in connection therewith."

The court did not overlook the evidence referred to; and upon consideration the former decision in this case is adhered to.

*All the Justices concur, except Bell, J., who dissents.*

GILBERT, J., concurs specially.