JONES *v.* THE STATE.

1. That the jurors constituting the panel of forty-eight which was put upon the prisoner were in the court-room when the latter was moving for a continuance, and "heard a part of the evidence proposed to be introduced in this case," was no cause of challenge to the array. If ground of objection to any of the jurors at all, it would be to the polls. Nor was it error to refuse to allow counsel for the accused to ask the jurors, as they were severally put upon him, if they heard the evidence introduced on the showing for a continuance, there being no refusal to allow any of the questions prescribed by statute.

2. While an indictment for seduction cannot be sustained by evidence showing that a rape was committed, the mere fact that the female offered some slight resistance to the sexual intercourse does not make the crime rape, when it appears that she really consented to the act, and that the accused did not have carnal knowledge of her forcibly and against her will.

3. It was not error, on the trial of an indictment for seduction, to read to the jury the section of the code defining this offence, although the indictment alleged that the seduction was accomplished by "persuasion and promises of marriage," and did not charge that "any other false and fraudulent means" were used, the court distinctly informing the jury that the words last above quoted, repeating them, were left out of the indictment, and that the State relied for conviction upon proof of persuasion and promises of marriage.

4. The numerous charges of the court complained of in the motion for a new trial being substantially correct presentations of the law applicable, and entirely consistent with previous rulings of this court upon similar questions, were not erroneous, and therefore afforded no cause for setting aside the verdict.

5. The verdict was manifestly just, and the court did right in refusing a new trial.

December 2, 1892.

Criminal law. Seduction. Juror. Charge of court. Before Judge FISH. Sumter superior court. May term, 1892.

The indictment charged the commission of the crime of seduction "by persuasions and promises of marriage." The defendant was convicted, and he excepted to the overruling of his motion for a new trial. In addition to the grounds that the verdict is contrary to law and

evidence, it is alleged that the finding of the jury is decidedly and strongly against the weight of the evidence, for the reason that the testimony of the female alleged to have been seduced shows that, the first time the defendant had intercourse with her, he committed the crime of rape. Following is her testimony:

When he (defendant) first commenced coming to see me, he said that he would marry me if I would yield to him; he would marry me if I would yield to him by love. I have known him ever since I was a little girl. I was going to school, me and him together; he commenced showing his respect to me. . . He would tell me that he loved me; I believed him; and he would carry me to parties. He did not pay no attention to no other girl. I thought he meant what he said; he told me that he loved me, and I believed what he said. . . I respected him and loved him better than anybody else. There was courtship; it was eight years—he came to see me eight years. The result of that courtship was, that I became pregnant. He promised that he would marry me at the risk of his life. In 1889, the first Saturday in July, between Seal's mill and home, in Sumter county, I yielded to him. He was a single man, and I was a single woman. He told me that if I did not yield to him, I did not love him; and I yielded to him by the love that I had for him. He told me that he would marry me if I yielded to him, and I yielded to him. . . I yielded to him three times after that. Every time that he would come he would promise to marry me. He first made that promise on the first Saturday in July, 1889. (The indictment was found at the November term, 1890.) He commenced in my early girlhood days, when I was nothing but a school-girl. We were engaged to be married about two years. There was no time set for our marriage; he just kept putting it off from time to time;

every time that he would come he would just put it off until the next time. The first time that I yielded to him, we started home, went down the road, came to a by-road that went by Mr. Forrest's; he said, "Let's take this road." He had the lines; I did not have hold of them; he drove right on. I never said anything. He went down, got nearly to Mr. Law's. I yielded to him by his promising to marry me. I believed him; I believed what he said. Q. How often did he come to see you during that time? A. He come first, missed three weeks; then the next time he missed two weeks; every two or three weeks he would come. In our early courtship he came to see me every two or three weeks; he would come every other Sunday. He lived about four miles from me, around, and about two miles through. When I yielded to him he promised me that he would marry me. I yielded to him by his telling me that he would marry me. I loved him better than anybody else that lived. I thought he loved me, but I don't reckon he did. I never had any sexual intercourse with any other man besides him. The result of the intercourse that I had with him was, that I became pregnant. This is his child; he is the father of it, and I am the mother.

Cross-examined: I have been sworn in this case once before. I will be twenty-two years old in November. Yes, I say that our courtship had been going on since my childhood, when I went to school with him. . . . I remember swearing in this case before, how this first intercourse was had with me. The first time that we had sexual intercourse was between Seal's mill and home, in the buggy. I was sitting in the buggy on the seat, and he was down in the foot. I did not swear before, that Mr. Jones took hold of me and had connection with me against my will. I don't think that I swore before, "It was not in my power to prevent his doing what he did, but he just caught hold of me and

done it anyhow." I don't think that I swore before, "He had hold of me; I could not have used the members of my body in such a way as to have prevented him from having carnal knowledge of me." I might have sworn that, but I don't think that I did. That was not true. It is true that he drove in the by-road. That was the first time that I ever had connection with a man, and it was done in a buggy. I was sitting on the seat, and he was in the foot. I don't think that I swore before, "I did not consent to what he done; he just caught hold of me and done it anyhow." I don't think that is true—I don't remember. I don't think it is true that at that time, the first time I ever had carnal intercourse with a man, he caught hold of me and done it by force and without my consent. I don't think that I swore it exactly that way. Q. Is not that true? A. Yes, sir, I reckon it is true. Q. It is true that what he done on that occasion was done by force? A. It was that time. At that time I was about 13 or 14 years old—15—it was in 1889, and I will be 22 in November next. The courtship had been going on ever since I was a school-girl. I was about twelve years old when it first started. I did not know what courtship meant then. No, I did not know what promises of marriage meant then. It is not true that at that time he drove out into that by-road, the time that Mr. Jones first knew me, not a single word was said about marriage. I did not swear that before. I don't think that I swore before, that "nothing was said about marriage, but I could not prevent his taking it—he took it anyhow." I might have sworn that, but I don't think I did. The next time that Mr. Jones ever had anything to do with me was between the Methodist church and home, in Sumter county. I was then sitting on the seat in the buggy, and he was in the foot of it. That was about two or three weeks after he had first

intercourse with me. The next time that he had intercourse with me was between the Baptist church and home. I was then sitting on the seat in the buggy, and he was in the foot of it. That is the last time that he ever had carnal knowlege of me. The first time that he had connection with me was in 1889. I will be 22 years old next November. Yes, I guess that would make me 18 years old at the time it occurred. I was about two miles from my father's house. He carried me home. When I got there I made no alarm to my mother. She was at home. I made no report of this to anybody. I was not injured at that time. I don't think that I swore, on the former trial, that Mr. Jones on the first occasion had carnal knowledge of me forcibly and against my will, that I did not consent to it. I yielded to him for the love I had for him. Q. Did you not swear on the other trial that you yielded to Mr. Jones forcibly, and could not have prevented his having that connection with you? A. I did at that time. Q. You did at that time? A. Yes, sir. That is the first time that he ever had anything to do with me. Q. Then you yielded to him through force? A. I did at that time, but the next time I did not, but for love. I don't think that I ever swore before, that the first time, in the buggy, I did not consent to it. At that time I tried to keep Mr. Jones from raising my clothes, but he just took hold of them and raised them anyhow, himself. Yes, I tried to keep him from raising them. I never made any efforts to prevent his penetrating me; I just sat there still in the buggy. I did not make any efforts with my person. I did not try to keep him from doing it, but just gave myself up for the love that I had for him. Q. Did you not swear before, that you tried, by using your limbs, to prevent him from having this connection? A. I did; I tried to prevent it; I told him that I would yield to him for the love that I had for him.

I did not, at the other trial of this case, swear that I did what I could to prevent him from having connection with me, and could not, and he did it anyhow. Yes, I was a witness against Mr. Jones when he was tried before. At the time that Mr. Jones had this first intercourse with me, I was about the size that I am now. Mr. Jones was then about the size that he is now. I weigh about 104 or 105. Yes, I did swear at the former trial, "I was smaller then than I am now, and weighed less." What I swore on the former trial is true, and what I swear now is true too; they are both true.

Redirect: I did not complain to my mother, because I believed that he would stand up to his promise; he had promised me he would marry me. When I say I did not consent the first time, I mean I did not give over to him—I just did not yield to him—I consented by the love that I had for him; that is what I mean. It was done by his just taking hold of me, by the love that I had for him, and by his promising to marry me.

Recross: It was late in the evening when we turned down that side road. He said that he loved me when we turned down that side road. I did not consent to what he did; he caught hold of me anyhow. I never did consent to him; he just took hold of me anyhow. I told him that was not the way home, but he kept on driving. I did not scream or cry out, nor make any fuss at all. I did not consent to what he did; he just took hold of me anyhow. He raised my skirt himself. I did try to keep it down.

Redirect: Q. Explain what you mean when you say you did not consent. A. Well, I just yielded to him by loving him. I told him, if he would marry me I would yield to him; he told me he would, and I yielded to him by my love. I just done it to gratify him.

Another ground of the motion is, that the court erred

in overruling a challenge to the array of jurors put upon the defendant, the grounds of challenge being: (1) "Because he believes and is informed that they were in the court-room and heard a part of the evidence proposed to be introduced in this case, to wit the evidence of Mrs. N. C. Knight, a witness for the defendant, who on motion for continuance of this case stated under oath in the presence of these jurors what she expected to testify on the trial." (2) "Because Jule Byrd, a witness for the State, stated on oath in the presence of these jurors what his son, H. M. Byrd, told him a witness for defendant told him he would swear." (According to the brief of evidence, but three witnesses were introduced on the trial: the one whose testimony is previously recited, her father, and one Thomas; all for the State.) The motion further assigns error on the refusal of the court to allow defendant's counsel to ask the jurors as they were put upon him, "if he heard on yesterday afternoon the statement of Mrs. Knight as to what she would swear in this case, or if he heard this morning the evidence of Mr. J. M. Byrd, a witness for the State, as to what his son, who was a witness for the defendant, would swear if he were here."

The remaining grounds assign error generally upon the following extracts from the charge of the court:

"The charge in the indictment is based upon this section of the code:" (Code, §4371, read.) "The charge made in the bill of indictment is, that this woman was seduced by persuasion and promises of marriage; 'other false and fraudulent means' are left out. The State relies for conviction upon the proof of persuasion and promises of marriage—seduction by those means.

"While persuasion as well as promises of marriage must be proved, yet it is not necessary to prove persuasion by direct or positive evidence; it may be shown by the satisfactory proof of such circumstances as human

experience and observation of human conduct would justify the jury in inferring persuasion.

"To make love to a virtuous unmarried woman, woo her, make honorable proposals of marriage, have them accepted, and afterwards undo her under a solemn promise of marriage or repetition of the engagement vow, is to employ persuasion as well as promises of marriage.

"When consent to sexual intercourse is part of the original agreement to marry, or betrothal, and is procured solely by the undertaking to marry, and nothing more, the transaction may be coarse and corrupt traffic and not seduction; but where consent is given pending a virtuous engagement, in consequence of a repetition of a promise to marry already made and accepted, the woman yielding in reliance on the plighted faith of her lover, and he intending that she shall trust and be deceived, such a case would be one of seduction.

"The term virtuous, as used here, has a legal significance or meaning. A woman is virtuous who has never had sexual intercourse with man. The question of what is a virtuous woman is a question of law for the court. A woman is presumed under the law to be virtuous, until the contrary is shown by proof.

"Persuasion and promises of marriage, made subsequent to the first sexual intercourse, would not make out the offence, but may be considered by the jury as circumstances, along with the other evidence and circumstances in the case, in deciding whether the first or the original intercourse was the result and in consequence of persuasion and promises of marriage, or whether it was otherwise, to be considered solely for that purpose and for no other.

"If you believe, from the evidence in the case, that these parties, W. A. Jones the accused, and V. H. Smith the person alleged to have been seduced, had sexual in-

tercourse in Sumter county within four years prior to the time that the bill of indictment was found, and that at the time the sexual intercourse was first had between them V. H. Smith had never had sexual intercourse with man, that they both were unmarried at the time, and that she was induced to yield, either readily or reluctantly, to the defendant, from persuasion and promises of marriage, and allow him, either readily or reluctantly, to have carnal knowledge of her, as a consequence of persuasion or promises of marriage, you would be authorized to find the prisoner guilty of seduction.

"If you believe from the evidence in the case, that these parties had sexual intercourse within two years next preceding the finding of the bill of indictment, but that that intercourse was not the result of persuasion and promises of marriage, but that it was voluntary upon the part of both the parties, and yet not the result of persuasion and promises of marriage, and that both of them at that time were unmarried, the act would still be an offence under the law, not seduction but fornication."

KIMBROUGH, PILSBURY & LANE and L. J. BLALOCK, for plaintiff in error.

C. B. HUDSON, solicitor-general, *contra.*

LUMPKIN, Justice.

1. Before the trial began, the accused moved for a continuance. While the motion was being argued, one Mrs. N. C. Knight, a witness for the accused, stated under oath what she expected to testify on the trial; and one J. M. Byrd, a witness for the State, stated on oath what his son, H. M. Byrd, a witness for the defense, told him he would swear. The record affords no information whatever beyond what has just been recited as to the statements made by the witnesses, Mrs. Knight and Mr. Byrd; but the accused challenged the array of jurors put upon him, on the ground that they were in the

court-room and heard these statements.   We are utterly unable to perceive any merit in this ground of challenge, since it contains not even the slightest intimation as to how the accused could have been injured by what had occurred; but even if the statements referred to had been fully set out in the exception to the action of the court in overruling this challenge to the array, and were of such a character as to indicate guilt on the part of the accused, the mere fact that it was heard by gentlemen in the court-room who afterwards constituted, in whole or in part, the panel of forty-eight jurors put upon the prisoner, would be no ground of challenge to the array. If any of the jurors, by reason of hearing the statements, were disqualified from trying the case, the proper way to object to them would have been by challenges to the polls.

Again, the accused complains that his counsel were not allowed to ask the jurors, as they were put upon him one at a time, if they heard the statements made by Mrs. Knight and Mr. Byrd when introduced as witnesses on the showing for a continuance.   The record being silent as to the nature of these statements, and this court consequently being unable to conjecture what effect, if any, they may have had upon the jurors' minds, we can see no error in the refusal of the court to allow the proposed questions to be asked.   As matter of right, the accused could ask the jurors only the questions prescribed in section 4682 of the code, and this right was not denied him.   If a juror is put upon the court as a trior, the examination may be extended, but this was not done in the present case.

2. Sexual intercourse resulting from seduction must necessarily be committed and accomplished with the consent of the female.   This is an essential and indispensable element of this particular crime.   Rape being the carnal knowledge of a female forcibly and against her

will, necessarily implies the entire absence of consent on her part. It follows, plainly enough and without argument, that a rape cannot be made the basis of a prosecution for seduction. The two offences are so totally different, they cannot be confused, nor can one of them by any possibility, legal or otherwise, be substituted for the other. People *v.* Brock, (Mich.) 31 N. W. Rep. 585. While this is manifestly true, it can scarcely be doubted that no modest girl or woman, upon the occasion of her first carnal contact with a man, will readily submit to the intercourse without some reluctance and some show of resistance. The extent to which this resistance will go depends largely, we presume, upon the nature, education, surroundings and previous associations of the female. We imagine it would be very difficult indeed to find a virgin of any age who would boldly and without shame or hesitation indulge for the first time in the sexual act; and while she may consent to it, it is perfectly natural to expect a greater or less degree of reluctance on her part. Indeed, it is easy to imagine that a woman may yield herself to the sexual embraces of a man when the act is absolutely repulsive to her, and offends, in the highest measure, her every sense of delicacy. The coyness, shyness and modesty which actuate a virtuous woman on such an occasion naturally find expression in the manifestation of some degree of unwillingness, or of an endeavor, feeble though it may be, to shield herself from that to which she is averse, but to which she really consents only for the sake of the man she loves and trusts. It would be mere mawkishness to affect ignorance of these well-known traits of female character. It is our duty to deal plainly and fairly with the questions made in this case, and this is impossible unless we recognize the existence of those principles of human nature, which are universally understood, and which are applicable to the facts presented. Pursuing this course,

it is safe to say that females possessing any degree of modesty shrink from the first act of sexual intercourse. This, we apprehend, is true even of those having passionate natures, for Byron wrote :

> " But who, alas! can love and then be wise ?
> Not that remorse did not oppose temptation,
> A little still she strove, and much repented,
> And whispering, 'I will ne'er consent'—consented."

And in the famous speech of the great Erskine, in Howard v. Bingham, he drew a picture of a " charming woman, endeavoring to conceal sensations which modesty forbids the sex, however enamoured, too openly to reveal,—wishing beyond adequate expression what she must not even attempt to express, and *seemingly* resisting what she burns to enjoy."

That a woman exhibits hesitation, reluctance and a slight degree of physical resistance does not, by any means, make the intercourse, when accomplished, rape. See State v. Horton, (N. C.) 6 S. E. Rep. 238 ; State v. Strattman, (Mo.) 13 S. W. Rep. 814.  The evidence in this case shows beyond doubt that Miss Smith, on the occasion when she first had sexual intercourse with the accused, really consented to the act, and that he did not then, nor at any other time, have carnal knowledge of her by force.  On cross-examination she did use some expressions tending to show a want of consent on her part, and from which it is sought to draw the inference that the connection was had by force and violence and against her will ; but the only fair and reasonable conclusion from her testimony is that she yielded to the wishes of the accused, and this is doubtless the truth of the case.   See in this connection the pertinent language of Sherwood, J., in the Strattman case *supra*, on page 817.   The little resistance she made was the outcome of her maidenly modesty, and was of the kind we have endeavored to describe.   She exhibited in testifying the

same sort of hesitation to confess her disgrace she had shown in consenting to the act by which it was accomplished.  Even if the first sexual contact between the accused and herself had amounted to a rape, and he had afterwards, by persuasion and promises of marriage, obtained her free consent to. have intercourse with him, and thus seduced her, he would be guilty of the crime of seduction.  A virtuous woman upon whom the crime of rape has been committed does not thereby lose her virtue; and if unmarried, there is no reason why she may not afterwards become the victim of seduction by her ravisher.

3. There was no error or impropriety in the court's reading to the jury section 4371 of the code, which defines the offence for which the accused was on trial. It is true the indictment alleged the seduction was accomplished only by persuasion and promises of marriage, and did not charge that any other false and fraudulent means were used by the accused; but the court took pains to so instruct the jury, and distinctly explained to them that the State relied for conviction upon proof of the latter alone.

4. The motion for a new trial sets forth at great length numerous extracts from the charge of the court (which will be found in the reporter's statement), and complains that they are erroneous.  These extracts are substantially the same, in effect, as the rulings made by this court in the case of *Wilson* v. *State*, 58 *Ga.* 328, and *O'Neill* v. *State*, 85 *Ga.* 383.  The present Chief Justice delivered the opinions in both of those cases, and with great care dealt with and discussed the legal questions involved, they being quite similar to those made in the case at bar in the several exceptions to the court's charge.  It is unnecessary to repeat or to comment upon what he so clearly and forcibly expressed in the cases cited; we adopt what is there said as sound law.

5. The evidence adduced on the trial of this case shows that Miss Smith was a modest, gentle, tender-hearted and confiding young girl; that from her childhood she had learned to love and trust the accused with all the fondness of her heart, and that he repaid her tender confidence and implicit faith by blasting and ruining her young life. The sad and simple story contained in her evidence, of the cruel wrong inflicted upon her, by its own eloquent pathos, will convince the mind of any candid reader that she yielded her virtue, under the persuasions and promises of the accused, for the sake of her love, and that the slight resistance she offered when the criminal intercourse first occurred was but the last despairing and feeble effort of a maiden's inborn modesty to save herself from disgrace and shame. The following brief extract from her testimony presents the case with painful and touching clearness : "I just yielded to him by loving him; I told him if he would marry me, I would yield to him; he told me he would, and I yielded to him by my love." While there is not evidence, in so many words, that persuasion as well as promises of marriage was used to accomplish the seduction, the circumstances detailed are ample to warrant the inference that persuasion, even to importunity, was resorted to in order to gain consent. The accused, with utter selfishness, ruined this unfortunate young woman and left her to her fate. Doubtless remorse has already overtaken him. Be this as it may, it was but just that the strong hand of the law should be laid upon him; and in the light of this record, we sanction the verdict of the jury and the judgment of the court, which for the time being, at least, makes the way of this transgressor hard.                    *Judgment affirmed.*