ANNUNCIATIO *v.* THE STATE.

No. 9249. MARCH 18, 1933. REHEARING DENIED APRIL 15, 1933.

*F. Joe Turner Jr.*, for plaintiff in error.

*Lawrence S. Camp*, attorney-general, *John A. Boykin*, solicitor-general, *T. R. Gress*, assistant attorney-general, *J. W. LeCraw*, and *E. A. Stephens*, contra.

HILL, J. Fortunatio Annunciatio was indicted for the offense

of rape; for that, "on the 8th day of April, 1932, with force and arms," he "did make an assault upon the person of Rosa Clower, and did strike, beat, and wound her, and did have carnal knowledge of and sexual intercourse with said Rosa Clower, a female, forcibly and against her will;" etc. He was tried and convicted, with a recommendation to mercy. His sentence was fixed at not less than ten years and not more than twenty years. Before arraignment or pleading, he filed two pleas in abatement, which pleas were overruled. He filed a demurrer to the indictment, which also was overruled. After verdict he filed a motion for new trial, which, as amended, was overruled. The defendant excepted to each of these three rulings.

The rulings on the pleas in abatement and on the demurrer to the indictment are not argued or mentioned in the brief filed by counsel for the defendant, and are to be treated as abandoned.

The prosecutrix testified: "During the month of April I was living on Elbridge Drive and going to school at Fulton High, over here at Washington and Fair Street. I met these two men here in Kress's and McCrory's on April 3d, I think. I never did really get acquainted with them there. I just watched them play the yo-yo, and heard their names mentioned by some of the girls. Neither one of them talked to me there. I never seen them at any place except there at the store, only the afternoon when I went to their apartment. I went to their apartment only once, that was with Frances Hutcheson. How come me to go there, I was with Frances on Tuesday afternoon, when Ambia Subia walked almost up town with Frances, and told Frances he wanted her to come to the apartment. Frances asked him, 'You want us to come to the apartment?' And he says, 'No, you come to the reception hall.' Following that invitation, we went up there the next afternoon, which was Tuesday; and when we got there, the first one who come to the door was Ambia, and he had on an apron and said he was cooking something. And we went to the kitchen, and he says come in there, and Frances says, 'In your room?' and he says, 'Yes,' and so we went in, and stayed until he come back in there, and he took Frances' books and laid them down on the dresser; that was Ambia. And Fortunatio was in the next room at that time, reading a paper. And then Fortunatio come to the door and spoke a few words in his own language

to Ambia, which I didn't understand. We were in Ambia's room when Fortunatio was talking to him, and he asked me my name, and then he asked me did I want to see his wife's picture, and I told him yes, and he says, 'Come in the next room,' and I went in the next room. No one went in there with me. I went in Fortunatio's room, and Ambia stayed in his room with Frances, and Fortunatio's door was left open for a few minutes, and after that few minutes Ambia came and said something in his own language I didn't understand, and Fortunatio closed the door. Then he asked me to sit down and I told him there were no chairs in the room, and he says, 'Sit down on the bed,' that was Fortunatio, and I sat down on the bed, and he got a pencil and scratch-pad and asked me what grade I was in in school, and I told him. He asked me was I taking Spanish. I told him no, and I asked him to write a few words in Spanish for me, and he did; and then he pulled me back on the bed and kissed me. He didn't show me anything else, and nothing else happened; and after he threw me on the bed and kissed me, then he felt of my parts, and he put his hand up under my dress. I fought him. I saw I could not keep him off. Then he put one leg on me and took out his private parts and put them against my private parts. When he finished I got up; all the time I was fighting, and I started crying. Then I got up, and I discovered I was bleeding. I went home that night, but I didn't tell my mother or my father anything about it; and my mother was milking; and I washed out my bloomers so she would not know it, and still she didn't know anything about it. . . This garment is the bloomers I refer to. When I took them home and washed them, I hung them on the back line. I didn't tell my mother, because I was afraid she would tell my daddy, and my daddy would beat me. Me and Fortunatio didn't have any conversation after he did this thing to me. He didn't speak to me, only to say to come back, and told me not to tell Frances, but he did not give me any reason for not telling her. Q. 'Tell the jury whether you ever consented for him to do this thing to you. A. No sir, I didn't.' He never asked me to let him do these things. What I did to try to prevent it, well, I fought, I slapped him once or twice—more than that, I think;" etc.

Dr. W. A. Arnold testified that he examined the girl about a week after the alleged rape, and found her hymen ruptured. He could

not state how long it had been so. The mother of the prosecutrix testified that she found the bloomers referred to in the girl's testimony; and that she knew the stains left on them were bloodstains, and were not caused by the girl's "periods." Paul Seymour and Harry Ingram testified that they saw Rosa Mae Clower and Frances Hutcheson go into the apartment-house on Washington Street; that they saw Rosa Mae Clower and the defendant in a room before the window, struggling; that they reported the matter to a policeman in the neighborhood, and the next day they reported the matter to the office of the solicitor-general, and a raid was made on the rooms of the defendant, and some girls were found there. Paul Seymour testified: "When this girl and boy was tussling by the window, they were both standing by the window. I don't know how far they were from the window. I know I seen them in the window. I guess they come right close up to the window when I seen them. I know I seen them. And I swear that was Miss Clower who wrestled by the window, when I was that distance from them across the street, looking up, and saw them at the window. I guess that tussling went on in the room for fifteen minutes."

The defendant introduced no witness. He made a statement in which he denied the charge against him.

■ The evidence was sufficient to authorize the verdict.

■ The motion for new trial assigns error because the court failed anywhere to instruct the jury that they were to disregard any testimony or evidence ruled out by the court. This ground states the rulings by the court on testimony of Frances Hutcheson, as follows: Q. (by the solicitor-general) : "Following the reception of this note here I first exhibited to you, state whether or not you got any invitation from either of these men." This was objected to as leading, suggesting, and calling for a conclusion of the witness, and the court overruled the objection by permitting her "to state whether she received an invitation." "Q. Frances, did you get an invitation to go any place from either of these men; and if so, state who was there? A. I got an invitation, and Rosa Mae Clower was present, but nobody else. The invitation was given to me. Ambia asked me to come to his room. There was nobody there at the time but Ambia and Rosa and me." On objection the court ruled out what happened when this defendant was not there, but failed to instruct the jury what was being ruled out, and that they should eliminate

such testimony from their consideration. The same witness testified: "I didn't go anywhere on that invitation, but following that I went to where those two boys were. I went to their room located at 255 Washington Street, Tallulah Apartment-house. Rosa Mae Clower went there with me one time. I went one time with her. That was on the 13th, to that house on Washington Street. No one met us at the door and told us what apartment to go to. He told us where to go." On objection to the statement, "He told us where to go," the court made the following ruling: "If she got an invitation from somebody else, I rule that out; but she can state she went." This ruling was sufficiently clear to indicate to the jury what testimony was ruled out. If a more explicit ruling was desired, counsel should have the point raised at the time. This ground is without merit. *Wheeler* v. *State,* 23 *Ga.* 292.

■ ■ The court permitted the witness Frances Hutcheson to testify, over objection that it was irrelevant, what transpired on the day following that on which Rosa Mae Clower was alleged to have been raped by the defendant, as follows: "The day I heard the noise was the second time I was there, and Evelyn Barnett was there with me that day. Ambia and Barnard met us in the hall, and after we went to Ambia's room, Evelyn Barnett went to Barnard's [defendant's] room." On previous cross-examination this witness had testified, in response to a question by the counsel for defendant: "I went there afterwards, after April 13, I went on the 14th, the next day, and Evelyn Barnett was with me that time; and me and Miss Barnett were in the apartment when the officers came and arrested these boys." The testimony of which complaint is made was brought out on redirect examination by the State, and was in substance the same as that elicited from the witness by the defendant's counsel. Its admission was not cause for reversal.

■ Frances Hutcheson testified, on cross-examination: "In this indictment the 23rd of April, 1932, when the grand jury says I was assaulted, struck, and beaten in that apartment, they are mistaken about that." The court ruled out this testimony, on objection by the State's counsel, on the ground that the indictment referred to by the witness, was a different transaction from the one on trial. The ruling was not erroneous.

■ Ground 5, complaining of the admission of certain testimony "over the timely objection of this defendant," is an insufficient as-

signment of error, and raises no question for determination by the Supreme Court. *Sikes* v. *Edwards,* 149 *Ga.* 168 (2) (99 S. E. 621).

■ It is complained that the name of Paul Seymour, a witness for the State, was not furnished to the defendant as one upon whose testimony the charge was founded, and who did not appear before the grand jury. It is alleged that if the defendant had known that this witness was to testify against him, he could have procured impeaching evidence that the witness had entered in the superior court a plea of guilty to the charge of unlawfully entering a house with intent to steal; and that the witness was under charge of larceny after trust, in the criminal court of Atlanta. This witness testified that "those girls would come there at 2:30 and stay there until 5:30, and I watched them, and any white American would do the same thing." The court of its own volition directed the witness to "leave that out." "It is respectfully submitted that the harm such a remark would work had been done; and this, taken in connection with the highly prejudicial and inflammable argument of the assistant solicitor-general, made it almost an impossibility for the court to have cured the harm and injury wrought this defendant by said alleged prejudicial remark on the part of said witness; and had this defendant known the intention of the State to use said witness against him, he would have been prepared to show this witness's true character to the jury, and it would have affected his credit with the jury." There is nothing to show that any demand was made for the list of witnesses to be used against this defendant. In *Fears* v. *State,* 125 *Ga.* 739 (3) (54 S. E. 661), this court held: "The failure to furnish the accused or his counsel with a copy of the indictment and list of witnesses, in the absence of a demand therefor, does not constitute a valid ground for setting aside the verdict of guilty." And see *Inman* v. *State,* 72 *Ga.* 269.

■ It is complained that the court erred in not declaring a mistrial, because of language used by the solicitor-general in his argument to the jury, as follows: "The United States took over the Phillipine Islands; and why, God only knows. We got a burden when we took over those islands. We have the Phillipino with us, and can't get rid of him. There should be some way to get the Phillipinos back, but there is no way to do so." The court refused to grant a mistrial, but warned the solicitor-general to confine his

argument to the evidence and issues in the case, and the court instructed the jury to disregard the argument of the solicitor-general as to the race of the defendant, and to try said case as they would any other case, irrespective of where defendant came from, or his race; that he was entitled to a fair and impartial trial, as any other defendant would be. Under the facts the judge did not err in refusing to declare a mistrial.

■ Ground 8 is as follows: "Because the court erred in giving the following in charge to the jury: 'Rape, as defined in our law, is the carnal knowledge of a female forcibly and against her will, and is punishable with death, unless recommended to mercy by the jury, in which event the defendant is to receive the same punishment as for assault with intent to rape, which is not less than one year, nor more than 20 years, at hard labor in the penitentiary. In order to constitute the crime of rape, there must be a penetration of the female organ of generation by the male organ of generation. That penetration may be slight or great, but there must be some penetration of the female organ by the male organ in order to constitute the crime of rape. Force is a necessary element to constitute the crime of rape. Such force may be exercised either by physical violence, or by threats of serious bodily injury which overpowers the female and causes her to yield against her will. Whether there was force in either or neither of these ways is for determination by the jury from the evidence upon this trial, considering the defendant's statement and giving it such force and effect as you see fit to place upon it. If you find beyond a reasonable doubt that there was force in either or both of these ways, you would·be authorized to convict, provided you also find the other necessary ingredient exists. If you find there was no force in either of these ways, you could not convict of rape.' Said charge was not adjusted to the evidence in this case, and was prejudicial to this defendant in that the court told the jury, in substance, that they must find that there was no force in either of these ways before they would be authorized to acquit this defendant, the language of the court being that, 'If you find there was no force in either of these ways, you could not convict of rape.' And this defendant says that there was no testimony or evidence offered by the State to show that any threats had been made by this defendant or any one else to do 'serious bodily injury' in order to overpower the will and obtain the consent of the

alleged victim, Rosa Mae Clower, she having sworn herself as follows: 'I told Mr. Stephens here a few minutes ago about everything that happened to me up there in that apartment. I told him everything that was said, everything Fortunatio said and done. And I told everything Ambia said in my presence. Neither of these boys threatened me with any violence; they said not to tell, if I did I would get into trouble. . . They didn't threaten to harm me if I told, in any way. . . Then he asked me to sit down, and I told him there were no chairs in the room. And he says, "Sit down on the bed." That was Fortunatio. And I sat down on the bed, and he got a pencil and scratch-pad and asked me what grade I was in in school, and I told him. He asked me was I taking Spanish. I told him no, and I asked him to write a few words in Spanish for me, and he did, and then he pulled me back on the bed and kissed me. He didn't show me anything else, and nothing else happened; and after he threw me on the bed and kissed me; then he felt of my parts, and he put his hand up under my dress. I fought him. I saw I could not keep him off. Then he put one leg on me and took out his private parts and put them against my private parts. When he finished I got up. All the time I was fighting, and I started crying. Then I got up and discovered I was bleeding.' Besides not being adjusted to the evidence in the case, the court in express words and language told the jury that if they believed the alleged rape was accomplishd by means of 'threats of serious bodily injury which overpowered the alleged victim's will and caused her to yield,' they would be authorized to find this defendant guilty, the exact language of the court being as follows: 'Force is a necessary element to constitute the crime of rape. Such force may be exercised either by physical violence, or by threats of serious bodily injury which overpower the female and cause her to yield against her will.' 'Whether there was force in either or neither of these ways is for determination by the jury from the evidence upon this trial, considering the defendant's statement and giving it such force and effect as you see fit to place upon it.' 'If you find beyond a reasonable doubt that there was force in either or both of these ways, you would be authorized to convict, provided you also find the other necessary ingredient exists.' 'If you find there was no force in either of these ways you could not convict.' And this defendant says that said charge was prejudicial to him in that the jury was

misled into believing that the court probably suspected that he had made threats of serious bodily injury to overpower the will of the alleged victim, and said charge authorized the jury to convict this defendant contrary to the evidence adduced by the State before them; and it is doubtful, therefore, whether it was the intention of the jury, under said charge, to find this defendant 'guilty of rape by physical force and violence,' or whether they intended, as authorized by said charge, to find this defendant 'guilty of rape by intimidation;' and this defendant says that for all of the reasons herein set out he should be granted a new trial." If this charge was unauthorized by the evidence, as is contended, it was not harmful to the accused.

■ Ground 9 complains because the court charged the jury as follows: "Gentlemen, under our law, all women are presumed to be virtuous until the contrary shall appear. So gentlemen, you are to consider this case on all the facts which have been introduced in the trial of this case, taking in connection therewith the defendant's statement; and if you believe this defendant did have carnal knowledge of Rosa Mae Clower at any time in the County of Fulton and State of Georgia, within four years from the time this indictment was found and returned into this court by the grand jury, and that the defendant did make the assault upon the person of Rosa Mae Clower, and did have carnal knowledge of and sexual intercourse with her, a female, forcibly and against her will, as alleged in the indictment, and you believe that beyond a reasonable doubt, you would be authorized to find the defendant guilty of the crime of rape, as charged in the indictment." This charge is not subject to the criticism urged in this ground, to wit, that the court by said words and language expressed the opinion to the jury as to what had or had not been proved.

The court did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur, except*

ATKINSON, J., dissenting. The charge dealt with in the eighth division of the court's opinion, in so far as it states that "force may be exercised either by physical violence, or by threats of serious bodily injury which overpowers the female and causes her to yield against her will," was not authorized by the evidence. In the first division of the majority opinion the evidence relied on to sustain the verdict is sufficiently stated. The facts are not identical with those

involved in *Davis* v. *State,* 152 *Ga.* 320, but they are such as to bring the case within the principles there stated and applied. The reasons for reversing the judgment in that case are so appropriate to the instant case on the question of sufficiency of the evidence to support the verdict that they will be repeated, as follows: "The sole question for consideration is whether the evidence was sufficient to support the verdict finding the defendant guilty of rape. The act of 1918 (Acts 1918, p. 259), making it unlawful for a person to have sexual intercourse with any female child under the age of fourteen (14) years, unless such person shall have previously become lawfully married to such female child, has no relevancy to the case, because the injured female was not 'under' the age of 14 years, she being within two months of 15 years of age at the time of the alleged injury. Rape is the carnal knowledge of a female, forcibly and against her will. Penal Code, § 93. As it involves force upon the part of the man and unwillingness upon the part of the woman, it differs from fornication, fornication and adultery, or seduction, which latter offenses involve consensual sexual intercourse. The offense of rape therefore can not coexist with any of the three latter offenses, based on the same sexual act. In the case of *Jones* v. *State,* 90 *Ga.* 616 (16 S. E. 380), the accused was charged with the offense of seduction. One contention made by the defense was that if the evidence showed any offense it was rape. In reviewing the judgment denying a new trial, this court entered into an elaborate discussion in the course of which it was said that: 'Sexual intercourse resulting from seduction must necessarily be committed and accomplished with the consent of the female. This is an essential and indispensable element of this particular crime. Rape, being the carnal knowledge of a female forcibly and against her will, necessarily implies the entire absence of consent on her part. It follows, plainly enough and without argument, that a rape can not be made the basis of a prosecution for seduction. The two offenses are so totally different, they can not be confused, nor can one of them by any possibility, legal or otherwise, be substituted for the other. People *v.* Brock, [64 Mich. 691], 31 N. W. 585.'

"In *Mathews* v. *State,* 101 *Ga.* 547 (29 S. E. 424), the girl was 16 years of age. In the course of the opinion it was said by Simmons, C. J.: 'Mathews was indicted for the offense of fornication and adultery, and convicted. The facts are set out fully in the of-

ficial report. It is contended by the accused that under these facts the verdict was contrary to law and the evidence; that if any crime was committed, according to the testimony, it was rape, and not fornication and adultery. The evidence, in brief, shows that Mathews had employed a girl as his clerk; that she did work for him at her father's house; that he boarded there; that one morning after breakfast, while her father and mother were absent, he and the girl were together in the room of the accused; that he took hold of her person and attempted to throw her upon a lounge; that she resisted; and that he finally 'forced her to consent,' and had sexual intercourse with her. He made no threats; there was no fear or intimidation, and the only violence used, as far as appears in the record, was throwing her upon the lounge. There were no bruises upon her person, her clothing was not torn, nor did she make any complaint after the act was committed until it was discovered, months thereafter, that she was pregnant. Under this state of facts, if the accused had been indicted for the offense of rape, the jury would not have been authorized to have convicted him. Rape is the carnal knowledge of a female forcibly and against her will; and if she consent to the sexual intercourse, although that consent may be reluctantly given and although there may be some force used to obtain her consent, the offense can not be rape. Although she may have resisted at the time the accused first took hold of her and at the time she was thrown upon the lounge, yet if she consented after this resistance and before the accomplishment of the sexual act, the offense was not rape. In order that the offense might constitute rape, she must have resisted with all her power and kept up that resistance as long as she had strength. Opposition to the sexual act by mere words is not sufficient. Any consent of the woman, however reluctant, is fatal to a conviction for rape. The passive policy will not do.' In *Taylor* v. *State,* 110 *Ga.* 150 (35 S. E. 161), it appears that Taylor was convicted of the offense of incestuous adultery alleged to have been committed with his stepdaughter who, as the record of file in this court shows, was 18 years of age. In the course of the opinion it was said by Simmons, C. J.: 'In portions of her testimony Miss McGuire stated that she had never consented to the illicit intercourse with Taylor, that in each instance it occurred against her will, and that she was forced to submit to his lustful embraces. Upon this testimony the court was

requested in writing to charge the jury that if Taylor had carnal knowledge of Miss McGuire forcibly and against her will, the offense was rape and not incestuous adultery. This request was properly refused; for, taking the testimony of Miss McGuire as a whole, *it is obvious that, if her testimony as to the sexual intercourse with the accused is true, she in fact consented to it,* so doing however with that reluctance and disinclination which would naturally be felt by any young girl in sustaining such relations with her mother's husband.'

"In *Cheney* v. *State,* 109 *Ga.* 503 (35 S. E. 153), the defendant was convicted of rape upon a girl 12 years old. The judgment of the trial court refusing a new trial was reversed, because 'The evidence as a whole was entirely insufficient to establish the guilt of the defendant.' In the course of the opinion it was said by Little, J.: 'The main witness for the State was the girl upon whom the rape was alleged to have been committed. While in her evidence she makes a statement of facts concerning the assault, amply sufficient to support the charge, she, at the same time, gives such an account of her actions when she was assaulted and while the offense was being committed as entirely negatives the force of her evidence that the plaintiff in error assaulted her. In relating the circumstances under which the assault was committed, she testified, among other things, that on Sunday morning in July, 1899, her father and mother went to church, leaving her two little brothers and her sister, nine years old, with herself at home; that previously to this time she had a conversation with the plaintiff in error, who had told her that he was coming to the house on that Sunday and would bring her a pound of candy; that the accused was near the house when her parents left, and she watched them until they got out of sight; that the accused then came to the house, and caught her by the arm; that she jerked loose and ran up-stairs, and he followed her; that in the room up-stairs he asked her to have intercourse with him; that she refused, and ran down-stairs into a little room, when he caught her, overpowered her, threw her on the floor, and violated her person. Witness resisted and screamed, and told her sister to scream and to tell her brother, who lived near, to come and make the accused leave. Had the witness stopped here, her evidence would have been sufficient to make a prima facie case; but, as her evidence appears in the brief, she further testified that the ac-

cused was on top of her for a half an hour; that she had a watch with her, and looked at it when he commenced the intercourse and when he desisted; that during the progress of the assault she laid the watch on the floor by her; and that it was half past ten o'clock when he commenced and eleven when he quit; that she consulted the watch because she desired to know how long it took a man to do that way with a woman; that the house in which the assault occurred was on a public road; that while the accused was committing the act, Mr. Bailey, a white man, passed on the road, and at that particular time the accused had her down on the floor forcing her person. She saw Bailey pass, but did not call to him, because she didn't desire him to see her in that kind of a fix. . . It was shown that the girl sent for her father and mother immediately after the occurrence, and communicated what had happened; . . it was also shown by the evidence of a physician, who examined her soon afterwards, that penetration of her person had been made. The girl testified that she was twelve years old; and it was also shown that she was of sufficient age and development for the menstrual period to occur.'

"If the female consent to the sexual intercourse, it is not rape, and she may express her consent by her conduct at the time of the intercourse. Where her conduct is such as to imply assent, no rape is committed, even though the female may verbally proclaim unwillingness to engage in the act of intercourse. Another part of the offense is force upon the part of the accused, exercised against the female. In *Vanderford* v. *State,* 126 *Ga.* 753 (55 S. E. 1025), it was said that 'Force is an element of the crime of rape, but it may be exerted not only by physical violence but also by threats of serious bodily harm which overpower the female and cause her to yield against her will.' In the course of the opinion this court quoted with approval from Bailey *v.* Commonwealth, 82 Va. 107 [3 Am. St. R. 87], where it was said: 'The law requires that the unlawful carnal knowledge shall be against her will. She must resist, and her resistance must not be a mere pretense, but must be in good faith. She must not consent. If she consent before the act, it will not be rape. But as to this consent, we may observe that it must be a consent not controlled and dominated by fear. . . A consent induced by fear of bodily harm or personal violence is no consent; and though a man lay no hands on a woman, yet if by

an array of physical force he so overpowers her mind that she dares not resist, he is guilty of rape by having the unlawful intercourse.' In considering the question of consent and fear upon the part of the female, it is proper also to take into consideration her age, mental capacity, and relation if any to the accused. In *Simmons* v. *State, 99 Ga.* 699 (27 S. E. 755), which occurred prior to the act of 1918, supra, raising the age of consent, the original record in this court shows that the injured female was a girl eleven years of age. She lived with her father at the residence of the accused at the time of the alleged offense. The defendant was convicted, and this court reversed the judgment refusing a new trial, holding: 'The indictment being for rape, and the evidence as a whole making at best a weak and unsatisfactory case upon the question whether or not the alleged sexual intercourse took place at all, and the evidence relied on to show that it was against the will of the female upon whom the rape is charged to have been committed (even upon the assumption that such intercourse was proved) being by no means clear or conclusive, the ends of justice require another trial.' In the course of the opinion by Simmons, Chief Justice, it was said: 'The evidence in this case makes at best a weak and unsatisfactory case upon the question whether or not the alleged sexual intercourse took place at all; and if it did take place as alleged, the evidence relied on to show that it was against the will of the female is by no means clear or conclusive. According to her testimony, it took place in the house of the accused, where she and her father boarded. He threw her upon a bed, and she submitted to the connection without any struggle or attempt at physical resistance. She stated that it hurt her, and she cried and told him not to do it, but did nothing further. So far as appears, it was merely because it hurt her that she cried and told him not to do it. It does not appear that she cried out in such manner as would attract the attention of other persons, or that there was any reason to suppose that if she did so she would not be heard. It appears from her testimony that before the alleged intercourse took place she prepared for it by pulling off one of her garments as the accused had told her to do, and afterwards, the garment having been used in wiping blood from herself and from the accused, she concealed it behind the bed, at his direction. She was a young girl; and if the intercourse took place as alleged, it may have been that she yielded through

fear. There was no evidence, however, that such was the case. She did not testify that there was any threat or intimidation, or that she was in any degree under the influence of fear; and the conviction can not be upheld upon a mere assumption that she was. She was of an age at which she was in law capable of consenting to the intercourse; and unless it was accomplished forcibly and against her will, the act was not rape. (Penal Code, § 93.) It is not required that the female shall do more than her age, strength, and the attendant circumstances make it reasonable for her to do in order to manifest her opposition; but it must appear beyond a reasonable doubt that there was actual resistance, or that resistance was prevented by violence or restrained by fear. Opposition by mere words is not enough. "Though in words she objects, if she makes no outcry and no resistance, she by her conduct consents, and there is no rape." 2 Bishop, New Crim. Law, § 1122. A "mixed" resistance or a merely equivocal submission will not do. There may be slight physical resistance even though there is a mental willingness to submit. Physical pain would naturally produce some manifestation of this kind; or it might be indicative merely of maidenly shame or coyness. As was said by Bronson, J., in the case of The People v. Hulse, 3 Hill (N. Y.), 316: "Although the woman never said yes, nay more, although she constantly said no, and kept up a decent show of resistance to the last, it may still be that she more than half consented to the ravishment. Her negative may have been so irresolute and undecided, and she may have made such a feeble fight as was calculated to encourage, rather than repel the attack." See the remarks of Lumpkin, J., on this subject, in *Jones* v. *The State,* 90 *Ga.* 625 (2), et seq. And so also, as to the degree of resistance required to be shown in such cases: 1 Wharton, Crim. Law (8 ed.), § 557; Clark, Crim. Law, § 82, p. 185; 19 Am. & Eng. Enc. of Law, art. Rape, pp. 951, 952.'

"In the case under consideration, the injured female, being the stepdaughter of the accused was nearly fifteen years of age and over the age of consent, as hereinbefore stated. She appears from her testimony to have been of average intelligence, and fully competent to comprehend the nature of the act. Her testimony is set out at length in the statement of facts, and it is unnecessary to repeat it here. It is sufficient to say that she did not, at the time, utter a word of protest or attempt any act of resistance, nor did the ac-

cused make any threat or do any act to excite her fears or in any manner prevent her from crying out or making physical resistance, or do anything to prevent her from reporting the matter after the occurrence. Examination of the evidence carried the impression that if the defendant had intercourse with the girl it was entirely consensual. Her testimony that her fear of the accused caused her to remain passive or irresistant, and to fail to report the occurrence earlier than she did, must be weighed in the light of the conduct of herself and the accused and other attendant circumstances, as testified by her before the jury and stated by her to other after the offense was alleged to have been committed. The girl's conduct was not such as to indicate to the accused that the sexual contact was against her will, or that she was induced thereto on account of fear of the accused, or by any threats of violence made to her by the accused, or other conduct upon his part calculated to produce such fear. Her conduct at the time, as detailed by her, expresses whether she was consenting to the act and whether she was driven to passiveness by fear of the accused and is to be taken in preference to her subsequent statement at the trial, which may have been a matter of afterthought. The evidence was insufficient to support the verdict, and it was error to refuse a new trial."